## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CONNIE WENDT, Derivatively on Behalf of OPKO HEALTH, INC., | |
| Plaintiff, | Case No. |
| v. | |
| PHILLIP FROST, JANE H. HSIAO, STEVEN D. RUBIN, JUAN F. RODRIGUEZ, ADAM E. LOGAL, JOHN A. PAGANELLI, RICHARD C. PFENNIGER, JR., RICHARD M. KRASNO, RICHARD A. LERNER, ALICE LIN-TSING YU, ROBERT S. FISHEL, ROBERT A. BARON, BARRY HONIG, JOHN O'ROURKE, MICHAEL BRAUSER, HARVEY KESNER, FROST GAMMA INVESTMENT TRUST, and SOUTHERN BIOTECH, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| OPKO HEALTH, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Connie Wendt ("Plaintiff"), by and through her counsel, derivatively on behalf of nominal defendant Opko Health, Inc. ("OPKO" or the "Company"), submits this Verified Stockholder Derivative Complaint against the OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities (each defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory

filings made by OPKO and other public companies with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by OPKO and other public companies; (iii) three purported class action lawsuits filed in the United States District Court for the Southern District of Florida, one purported class action lawsuit filed in the United States District Court for the Southern District of New York, and one purported class action lawsuit filed in the United States District Court for the District of New Jersey against OPKO and defendants Phillip Frost ("Frost"), Adam E. Logal ("Logal"), and Juan F. Rodriguez ("Rodriguez") alleging violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission of material facts necessary to make other issued statements not misleading, between September 26, 2013 and September 7, 2018, with respect to the Company's participation in a series of pump-and-dump schemes (collectively, the "Securities Class Actions"); (iv) an action brought by the SEC against Frost, OPKO, Frost Gamma Investments Trust ("FGIT"), Southern Biotech, Inc. ("Southern Biotech"), as well as defendants Barry Honig ("Honig"), John O'Rourke ("O'Rourke"), and Michael Brauser ("Brauser") for illegally engaging in three pump-and-dump schemes (the "SEC Action" or "SEC Complaint"); and (v) other publicly-available information, including media and analyst reports, concerning OPKO.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breaches of fiduciary duties, unjust enrichment, violations of the federal securities laws, and breaches of fiduciary duties for insider selling and misappropriation of information, brought on behalf of nominal defendant OPKO against certain of OPKO's current and former officers and members of the Company's Board of Directors (the "Board"), as well as entities and individuals controlled by

and/or closely aligned with defendant Frost that have harmed and/or participated with OPKO's directors and officers to harm the Company.

2.      Phillip Frost is OPKO's Chief Executive Officer ("CEO"), Chairman, and controlling stockholder.  Early in his career, defendant Frost was something of a wunderkind of the pharmaceutical industry.  He was known for successfully parlaying small companies into big paydays.

3.      Defendant Frost and a partner purchased the nearly-bankrupt Key Pharmaceuticals, Inc. ("Key") in 1972.  Frost was the chairman of Key from 1972 until he sold the company to Schering-Plough in 1986 for $836 million due to its early development of sustained release formulations of pharmaceutical drugs.  Defendant Frost reportedly received $100 million in the transaction and his estimated net worth by 1986 was $150 million.

4.      Next, Frost served as the Chairman and CEO of Ivax Corporation ("Ivax") from 1987 until 2005, when he sold Ivax to Teva Pharmaceuticals ("Teva") for $7.4 billion. Following that deal, the newly-minted billionaire Frost became Vice Chairman of Teva in January 2006.  He then became Teva's Chairman in March 2010 and held that position until March 2015.

5.      Following this string of successes, *Forbes* called Frost "the [Warren] Buffett of biotech."  But in recent years, Frost descended into the world of grift.  Instead of following his earlier blueprint of helping companies to develop successful drugs that could be sold to larger companies for astronomical gains, Frost began engaging in activities with shady individuals and engaging in illegal pump-and-dump schemes.

6.      OPKO is a Delaware corporation with its headquarters in Miami, Florida engaging in the diagnostics and pharmaceuticals business in the United States, Ireland, Chile,

Spain, Israel, Mexico, and internationally.  The Company continually notes how its reputation is tied to Frost's in every way.  The Company's SEC filings commonly include a section headed: "Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D."

7.     From at least September 26, 2013 to the present (the "Relevant Period"), defendant Frost, along with defendants Honig, O'Rourke, Brauser, and Harvey Kesner (collectively, the "Frost Pump-and-Dump Posse"), acquired substantial positions in small companies that were not yet publicly traded, they then merged the target companies into shell companies that they controlled.  Frost and OPKO's formerly good names were used to provide credence to the illegal schemes.  The next step in the schemes involved the Frost Pump-and-Dump Posse paying stock promoters to write positive articles about the target companies.  This was followed by artificial inflation of the companies' stock prices in concert with manipulative trading by the Frost Pump-and-Dump Posse and their respective investment affiliates.  Once the prices were adequately inflated, the Frost Pump-and-Dump Posse would sell their shares in a coordinated fashion, enriching themselves while harming outside investors and OPKO – that had purchased during the pump, but not taken part in the dump.  Throughout the Relevant Period, the Frost Pump-and-Dump Posse, with the assistance and/or acquiescence of the OPKO Individual Defendants and the entities they controlled, engaged in a series of unlawful schemes to artificially inflate the price of the stock of the target companies and failed to disclose their participation in the same.

8.     Several of these pump-and-dump schemes were revealed to OPKO's stockholders and the investing public on September 7, 2018, when the SEC issued a press release and filed a

complaint against defendants Frost, Honig, O'Rourke, Brauser, FGIT, and several of their associates and associated entities.

9.      This news caused OPKO's stock price to drop 18%, representing an over $565 million decline in market capitalization.  It also caused NASDAQ to halt trading of OPKO stock at 2:34 PM on September 7, 2018.  When trading resumed, on September 14, 2018, OPKO's stock price fell an additional 15%, representing an additional over $380 million reduction in market capitalization and a total drop of over $945 million in market capitalization.

10.     During the Relevant Period, OPKO's officers and directors and several Frost-related entities and actors breached their fiduciary duties to the Company by failing to maintain internal controls and by causing and/or allowing the Company to make a series of materially false and misleading statements regarding its business, operations, prospects, and compliance with the law.   These materially false and misleading statements failed to disclose that: (1) OPKO, Frost, and the Frost Pump-and-Dump Posse and its related entities were engaged in several illegal pump-and-dump schemes in violation of the federal securities laws; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its stock would be suspended from trading by NASDAQ; (3) the Company failed to maintain adequate internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     Each of the OPKO Individual Defendants failed to correct and/or caused OPKO to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.     Defendant Frost carried out a series of self-dealing, related-party transactions by having OPKO invest as cover for the pump-and-dump schemes described herein, rendering him personally liable to the Company for breach of his fiduciary duty of loyalty.

13.     Defendants Logal, Richard A. Lerner ("Lerner"), Steven D. Rubin ("Rubin"), and John A. Paganelli ("Paganelli") unlawfully profited at OPKO's expense by selling large quantities of stock at artificially-inflated prices prior to the news of the various pump-and-dump schemes being made public.

14.     In light of the misconduct by these defendants, the Company has been and/or will be forced to expend millions of dollars to:  (1) defend against the SEC Action on behalf of itself, Frost, FGIT; and Southern Biotech; (2) pay the fines levied by the SEC in the settlement of the SEC Action; (3) defend against the Securities Class Actions on behalf of itself, Frost, Logal, and Rodriguez; (4) defend against the ongoing investigation by the Federal Bureau of Investigation into criminal conduct by defendant Frost and others; (5) undertake internal investigations, and (6) pay expenses related to the litigation involving each of the companies that were part of the various pump-and-dump schemes described herein.   The Company has already expended millions of dollars in the unjust enrichment the OPKO Individual Defendants who were improperly over-compensated by the Company while it engaged in the illegal pump-and-dump schemes and who benefitted from the wrongdoing alleged herein.

15.     The named defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.  In addition, the OPKO Individual Defendants violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 by soliciting OPKO stockholder votes for, *inter alia*, director reelection and advisory approval of executive compensation, while simultaneously

misrepresenting and/or failing to disclose the truth regarding the pump-and-dump schemes.  The OPKO Individual Defendants also violated Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act by defrauding OPKO into overpaying for stock in the pump-and-dump schemes described herein.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges claims for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

17.     This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over nominal defendant OPKO because it is authorized to do business in this State, has consented to service in this State, and is headquartered in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to OPKO occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

19.     Plaintiff is a stockholder of OPKO, was a stockholder of OPKO at the time of the wrongdoing alleged herein, and has been a stockholder of OPKO continuously since that time.

20.     Nominal defendant OPKO is a Delaware corporation with its principal executive offices located at 4400 Biscayne Boulevard, Miami, Florida 33137.   OPKO's common stock trades on the NASDAQ Global Select Market under the ticker symbol "OPK."

21.     Defendant Frost has been OPKO's CEO and Board Chairman since 2007.  He is also the controlling stockholder of the Company.  He controls FGIT with defendants Jane H. Hsiao ("Hsiao") and Rubin and is a member of the Frost Group, LLC (the "Frost Group") with defendants Hsiao and Rubin.  According to the Company's proxy statement filed on Schedule 14A with the SEC on April 30, 2018 (the "2018 Proxy"), as of April 18, 2018, defendant Frost beneficially owned 196,624,883 shares of the Company's common stock, which represented 34.76% of its outstanding shares.   The 2018 Proxy also states that Frost-affiliated entities, including the Frost Group and FGIT, respectively own 20,091,062 shares, representing 3.59% of OPKO's outstanding common stock, and 189,325,505 shares, representing 33.54% of OPKO's outstanding common stock.   Thus, defendant Frost and his related entities own almost 72% of OPKO's common stock.  In 2016, he received $3,060,600 in compensation, which included $960,000 in salary, $2,090,000 in option awards, and $10,600 in all other compensation.   In 2017, he received $970,800 in compensation from the Company, which included $960,000 in salary, and $10,800 in all other compensation.  Defendant Frost is named as a defendant in the SEC Action and the Securities Class Actions.  On December 27, 2018, defendant Frost agreed to pay a total of $5,523,387.52 to the SEC – a five-million-dollar penalty and the disgorgement of $433,181.06 in profits plus $90,206.46 interest – to settle the SEC Action.  Defendant Frost is also permanently barred from participating in the offering of any penny stock.

22.     Defendant Hsiao has been OPKO's Vice-Chairman and Chief Technology Officer since May 2017 and a director since February 2007.  According to the 2018 Proxy, as of April 18, 2018, she beneficially owned 33,328,037 shares of the Company's common stock, representing 5.94% of outstanding shares.  She controls FGIT with defendants Frost and Rubin and is a member of the Frost Group with defendants Frost and Rubin.  Hsiao participated in the pump-and-dump schemes both directly and through her personal investment trust, Hsu Gamma Investment Trust ("Hsu Gamma").  In 2016, defendant Hsiao received $2,851,600 in compensation from the Company, consisting of $900,000 in salary, $1,881,000 in option awards, and $70,600 in all other compensation.  In 2017, she received $915,800 in compensation from the Company, consisting in $900,000 in salary, and $15,800 in all other compensation.

23.     Defendant Rubin has been OPKO's Executive Vice President – Administration since May 2007 and a director since February 2007.  He controls FGIT with defendants Frost and Hsiao and is a member of the Frost Group with defendants Frost and Hsiao.  According to the 2018 Proxy, as of April 18, 2018, he beneficially owned 7,412,650 shares of the Company's common stock, representing 1.32% of outstanding shares.  In 2016, defendant Rubin received $2,701,600 in compensation from the Company, consisting of $810,000 in salary, $1,881,000 in option awards, and $10,600 in all other compensation.  In 2017, he received $820,800 in compensation from the Company, consisting of $810,000 in salary and $10,800 in all other compensation.

24.     Defendant Rodriguez was OPKO's Senior Vice President and Chief Financial Officer ("CFO") from July 2012 to April 1, 2014.  Defendant Rodriguez is named as a defendant in the Securities Class Actions.

25.     Defendant Logal has been OPKO's Senior Vice President and CFO since March 2014.  Defendant Logal is named as a defendant in the Securities Class Actions.

26.     Defendant Paganelli has been a director of OPKO since December 2003. Previously, he was OPKO's Interim CEO and Secretary from June 29, 2005 to March 27, 2007 and OPKO's Board Chairman from December 2003 to March 27, 2007.  He is a member of the Board's Audit Committee.  According to the 2018 Proxy, as of April 18, 2018, defendant Paganelli beneficially owned 478,515 shares of the Company's common stock.  In 2016, he received $97,350 in compensation from the Company, consisting of $23,750 in fees earned or paid in cash and $73,600 in option awards.  In 2017, he received $83,758 in compensation from the Company, consisting of $33,958 in fees earned or paid in cash and $49,800 in option awards.

27.     Defendant Richard C. Pfenniger, Jr. ("Pfenniger") has been a director of OPKO since 2008 and is the Chair of the Board's Audit Committee.  According to the 2018 Proxy, as of April 18, 2018, he beneficially owned 310,000 shares of the Company's common stock.  In 2016, defendant Pfenniger received $98,600 in compensation from the Company, consisting of $25,000 in fees earned or paid in cash and $73,600 in option awards.  In 2017, he received $109,700 in compensation from the Company, consisting of $35,000 in fees earned or paid in cash and $74,700 in option awards.

28.     Defendant Richard M. Krasno ("Krasno") has been a director of OPKO since February 2017.  He is also a member of the Board's Audit Committee.

29.     Defendant Lerner has been a director of OPKO since 2007.  According to the 2018 Proxy, as of April 18, 2018, he beneficially owned 351,172 shares of the Company's common stock.  In 2016, defendant Lerner received $96,100 in compensation from the Company, consisting of $22,500 in fees earned or paid in cash and $73,600 in option awards.  In

2017, he received $79,800 in compensation from the Company, consisting $30,000 in fees earned or paid in cash and $49,800 in option awards.

30.     Defendant Alice Lin-Tsing Yu ("Yu") has been a director of OPKO since 2009. According to the 2018 Proxy, as of April 18, 2018, she beneficially owned 200,000 shares of the Company's common stock.  In 2016, defendant Yu received $88,600 in compensation from the Company, consisting of $15,000 in fees earned or paid in cash and $73,600 in option awards.  In 2017, defendant Yu received $69,800 in compensation from the Company, consisting of $20,000 in fees earned or paid in cash and $49,800 in option awards.

31.     Defendant Robert S. Fishel ("Fishel") has been a director of OPKO since April 3, 2018.

32.     Defendant Robert A. Baron ("Baron") was a director of OPKO from 2003 to 2017.  He was also a member of the Board's Audit Committee until January 23, 2017.

33.     Defendant Honig has extensive business dealings with defendant Frost, OPKO's controlling stockholder.  Honig has reportedly helped dozens of small companies go public, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  He works at an office in Boca Raton, Florida with defendant O'Rourke.  He also co-owns Southern Biotech, a shell company used in the pump-and-dump scheme, with Brauser and Frost.  He is named as a defendant in the SEC Action.

34.     Defendant O'Rourke has extensive business dealings with defendant Frost, OPKO's controlling stockholder.  O'Rourke was formerly the CEO of Riot Blockchain, a company that was a took part in another illegal scheme by the Frost Pump-and-Dump Posse not included in the SEC Action.  He currently works at an office with defendant Honig in Boca

Raton, Florida.  He also was integral to the pump-and-dump schemes alleged in the SEC Action and is named as a defendant in the SEC Action.

35.     Defendant Brauser has extensive business dealings with defendant Frost, OPKO's controlling stockholder.  He currently works out of the same building in Miami as defendant Frost.  He was an integral part of each of the pump-and-dump schemes and is named as a defendant in the SEC Action.

36.     Defendant Harvey Kesner ("Kesner") was formerly a partner at the law firm of Sichenzia Ross Ference & Kesner LLP.  He served as counsel to the Frost Pump-and-Dump Posse when they were engaging in their pump-and-dump activities and also personally profited alongside the other schemers.  Kesner was forced out of his law firm just days before the SEC Complaint was filed.

37.     Defendant FGIT is a Florida trust, formed in 2002.  According to the 2018 Proxy, as of April 18, 2018, FGIT beneficially owned 189,345,505 shares of OPKO common stock, representing 33.54% of its outstanding shares.  FGIT is controlled by defendants Frost, Hsiao, and Rubin.  It is named as a defendant in the SEC Action.

38.     Defendant Frost Group is an entity made up of defendants Frost, Hsiao, and Rubin that beneficially owns 3.59% of OPKO's common stock, as of April 18, 2018.

39.     Defendant Southern Biotech is a Nevada corporation that defendant Honig operates and co-owns with defendants Frost and Brauser.  It is named as a defendant in the SEC Action.

40.     Defendants Frost, Hsiao, Rubin, Rodriguez, Logal, Paganelli, Pfenniger, Krasno, Lerner, Yu, Fishel, and Baron are referred to herein as the "OPKO Individual Defendants." Defendants Frost, Honig, O'Rourke, Brauser, and Kesner are referred to herein as the "Frost

Pump-and-Dump Posse."  Defendants FGIT, Frost Group, and Southern Biotech are referred to herein as the "Frost Entities."

## DUTIES OF THE OPKO INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers and/or directors of OPKO and because of their ability to control the business and corporate affairs of the Company, the OPKO Individual Defendants owed and owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The OPKO Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     The OPKO Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of OPKO were required to, among other things:

        a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        b.      Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        c.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        d.      Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

        e.      Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

44.      Each of the OPKO Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the OPKO Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the OPKO Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     The Company has adopted a Code of Business Conduct and Ethics for its officers

and directors (the "Code").  The Code states:

## I.     Lawful and Ethical Behavior is Required at All Times

OPKO Health, Inc.'s ("OPKO", the "Company") mission is to develop and deliver innovative products and services that save and sustain lives and, in doing so, become a good corporate citizen of the communities in which the Company operates.  To achieve this goal and to allow OPKO to maintain the trust of its stakeholders and provide sustainability to its business, the Company expects that OPKO and each of its subsidiaries, and their respective directors, officers employees, contractors, and agents (each, a "Covered Person") will obey all applicable laws and regulations, as well as all Company codes, policies, procedures and directives.  OPKO and Covered Persons must obey not only the letter, but also the spirit of the law.

## II.     Avoid Conflict of Interests

The Company respects the rights of its directors, officers, employees, and agents to manage their affairs and investments and does not wish to impinge upon their personal lives.  At the same time, such persons should avoid situations that present a potential conflict between their interests and the interests of the Company. Directors and employees owe the Company their loyalty and must avoid any investment or association that interferes with the independent exercise of sound judgment in the Company's best interests.   Accordingly, Covered Persons must be careful to avoid situations where personal interests could conflict or appear to conflict with the interests of OPKO.  A "conflict of interest" occurs when an individual's private interest interferes in any way – or even appears to interfere - with the interests of the Company as a whole.

## III.     Maintain Accurate Financial Records

All of OPKO's books, records, accounts, and financial statements must be maintained in reasonable detail and must appropriately and accurately reflect all OPKO transactions as required under applicable law.  No false or artificial entries shall be made in the records of the Company for any reason, and no payment on behalf of the Company shall be approved or made with the intention or understanding that any part of such payment is to be used for any purpose other than that described by the documents supporting the payment.  Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying OPKO internal reports, reports filed with the Securities and Exchange Commission or press releases issued by the Company should strive to ensure that OPKO's financial and other disclosure is timely, accurate and transparent and that OPKO's reports and press releases contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of the Company's

business and finances and the quality and integrity of the Company's accounting and disclosures.

46.     With regard to the Board and its various committees' duties, the Company's 2018

Proxy notes the following:

> The Board's role in the risk oversight process includes receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks. In connection with its reviews of the operations of the Company's business units and corporate functions, the Board considers and addresses the primary risks associated with those units and functions. Our full Board regularly engages in discussions of the most significant risks that the Company is facing and how these risks are being managed.

> In addition, each of the Board's committees, and particularly the Audit Committee, plays a role in overseeing risk management issues that fall within each committee's areas of responsibility as described below under the heading "Standing Committees of the Board of Directors." Senior management reports on at least a quarterly basis to the Audit Committee on the most significant risks facing the Company from a financial reporting perspective and highlights any new risks that may have arisen since the Audit Committee last met. The Audit Committee also meets regularly in executive sessions with the Company's independent registered public accounting firm and reports any findings or issues to the full Board. In performing its functions, the Audit Committee and each standing committee of the Board has full access to management, as well as the ability to engage advisors. The Board receives regular reports from each of its standing committees regarding each committee's particularized areas of focus.

47.     The OPKO Individual Defendants failed to maintain the standards laid out by the

law and the Company itself, resulting in the breaches of fiduciary duty and the violations of the

federal securities laws described herein.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

48.     OPKO is a healthcare company that engages in the diagnostics and

pharmaceuticals business.  Its Chairman, CEO, and controlling stockholder – defendant Frost –

amassed a multi-billion-dollar fortune by purchasing small companies, developing their

promising products, then selling them to large pharmaceutical companies for astronomical profits.

49.     After medical school, Frost developed a device for taking skin biopsies and became friends with a lawyer named Michael Jaharis.  They went into business around an ultrasound device for cleaning teeth and then merged that company with the nearly-bankrupt Key Pharmaceuticals in 1972 and eventually sold that company, the developer of some of the first sustained release formulations, to Schering-Plough in 1986 for $836 million.  One year later, defendant Frost founded Ivax, a maker of generic drugs and eventually sold that Company to Teva for $7.6 billion in 2005.

50.     When Acuity Pharmaceuticals Inc., Froptix Corporation, and eXegenics, Inc. merged on March 27, 2007, Frost became the CEO and Chairman of the newly formed OPKO Health, Inc.

51.     Frost and OPKO are both immensely important to one another.  When describing Frost's relationship with OPKO, Oracle Partners' Larry Feinberg, a veteran hedge fund manager who has owned shares in Frost-affiliated companies since the 1990s, stated that, "[Frost] views OPKO as his holding company.  It is his Berkshire Hathaway of health care."

52.     OPKO's Form 10-K for 2017, filed with the SEC on March 1, 2018 (the "2017 10-K"), states the following regarding Frost's control over OPKO and OPKO's reliance on Frost for its success:

> ***Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D.***
>
> Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.  The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations.  Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and

attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners.  Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments.  If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.  If we fail to attract and retain key management and scientific personnel, we may be unable to successfully operate our business and develop or commercialize our products and product candidates.  We will need to expand and effectively manage our managerial, operational, sales, financial, development, and other resources in order to successfully operate our business and pursue our research, development, and commercialization efforts for our products and product candidates.  Our success depends on our continued ability to attract, retain, and motivate highly qualified management and pre-clinical and clinical personnel.  The loss of the services or support of any of our senior management, particularly Dr. Phillip Frost, our Chairman of the Board and CEO, could delay or prevent the development and commercialization of our products and product candidates.

53.     The 2017 10-K also describes the control that Frost and his affiliates have over

OPKO, as follows:

> ***Directors, executive officers, principal stockholders and affiliated entities own a substantial amount of our capital stock, and they may make decisions that you do not consider to be in the best interests of our stockholders.***
>
> As of February 26, 2018, our directors, executive officers, principal stockholders, and affiliated entities beneficially owned, in the aggregate 41.13% of our outstanding voting securities.  Frost Gamma Investments Trust ("Gamma Trust"), of which Phillip Frost, M.D., the Company's Chairman and CEO, is the sole trustee, is deemed to beneficially own in the aggregate approximately 32.95% of our Common Stock as of February 27, 2018.  As a result, Dr. Frost acting with other members of management, would have the ability to significantly impact the election of our Board of Directors, the adoption or amendment of provisions in the Company's Certificate of Incorporation, the approval of mergers and other significant corporate transactions, and the outcome of issues requiring approval by our stockholders.  This concentration of ownership may also have the effect of delaying or preventing a change in control of our company that may be favored by other stockholders.  This could prevent transactions in which stockholders might otherwise recover a premium for their shares over current market prices.

54.     Although Frost had significant past glory growing small pharmaceutical companies into giant successes, in recent years he started doing business with a group of shady individuals and engaging in illegal stock manipulation.

**B.     The Three Pump-and-Dump Schemes in the SEC Action**

55.     According to the SEC Complaint, between 2013 and 2018 defendant Frost – along with defendants Honig, Brauser, O'Rourke, Kesner, and their related entities – conducted three largescale pump-and-dump schemes.  The Frost Pump-and-Dump Posse in coordination with the OPKO Individual Defendants and the Frost Entities caused or allowed OPKO to participate to varying degrees in each of these schemes.

**1.     The BioZone Pump-and-Dump Scheme**

56.     The first pump-and-dump scheme described in the SEC Action[1] was perpetrated against the stockholders of BioZone Laboratories, Inc. ("BioZone,").  In the BioZone scheme, defendants Honig and Brauser teamed up with defendant Frost, who frequently was brought into Honig and Brauser deals involving biotech issuers to give them an air of respectability based on Frost's formerly illustrious biotech investing history.  Defendants Frost, Honig, and Brauser then caused BioZone to issue shares to themselves and their associates through a series of so-called "private investments in public equities," or "PIPE" financings.  They drove the price of BioZone stock higher by secretly paying for a misleading promotional campaign and combining it with Honig and Brauser's manipulative trading, and then Frost, Honig, and Brauser unlawfully sold their BioZone shares into the market for inflated proceeds of approximately $9,260,000.

---

[1]  The SEC Action does not name the actual companies whose stock was pumped and dumped, instead they are referred to as Company A, Company B, and Company C.  However, the SEC Action does list their officers and other characteristics in sufficient detail to allow them to be identified by third-party sources reporting on the SEC Action.

57.     In November 2010, defendant Honig, with his associates John Stetson ("Stetson") and Mark Groussman ("Groussman"), purchased one-third of a publicly-traded shell company, International Surf Resorts, Inc. ("Surf Shell").  Then, in December 2010, defendants Frost and Brauser each purchased the remaining two thirds of Surf Shell.  The members of the Frost Pump-and-Dump Posse disguised their role in the acquisition by purchasing the shares from an entity used to make the purchase of the shell company.  Soon after acquiring Surf Shell, defendants Frost, Honig, and Brauser installed a Frost associate as its sole disclosed director.  Defendant Kesner was the attorney presiding over the secretive transaction.

58.     Around the same time, defendants Frost, Honig, and Brauser approached management of a private biotech company, BioZone, with a proposal for taking it public.  Defendants Frost, Honig, and Brauser proposed a reverse merger, by which BioZone, then a privately-held California company in the business of manufacturing over-the-counter pharmaceutical products, would merge into Frost, Honig, and Brauser's publicly-traded shell-company, Surf Shell.  At the time, BioZone was working on developing a formulation using a patented technology called "Qusomes" that it hoped to use in large-scale drug markets, and saw the deal as creating financing possibilities to fund the company's research.

59.     Indeed, Frost, Honig, and Brauser told BioZone that the public company deal would include raising $8 to $15 million dollars to support research and development into Qusomes.  They also persuaded BioZone's CEO to go along with the merger by promising him 6,650,000 shares of the newly-created public company.

60.     The proposed merger hit a snag, however, in March 2011.  Pursuant to a $3 million credit line BioZone had with a San Francisco bank, the bank had authority to approve all major transactions, and, in March 2011, it declined to approve the proposed merger.  The merger

nonetheless closed in June 2011, and the bank thereafter sent a default notice.  On September 8, 2011, BioZone's Honig-and-Brauser-installed CFO completed the payoff of the credit line thereby removing the obstacle to the merger, but saddling BioZone with short-term, high-interest rate notes that included a conversion option into equity of the company.

61.     In conjunction with the reverse merger, Frost, Honig, and Brauser arranged the sale of certain unprofitable Frost assets to the new company in exchange for 8,345,310 shares and the obligation of the company to file a registration statement for these shares, providing further value to Frost.

62.     After the closing of the reverse merger of BioZone into Surf Shell in June 2011, the surviving public company became BioZone.  Defendants Frost, Honig, and Brauser, along with Groussman and Stetson, controlled the vast majority of the BioZone's stock and were affiliates of BioZone.  Following the merger, BioZone listed its corporate address as 4400 Biscayne Boulevard in Miami, the same business address then shared by defendants Frost, Honig, and Brauser.

63.     In addition to controlling the vast majority of BioZone's outstanding shares, defendants Frost, Honig, and Brauser exercised control over the management of BioZone. Before the deal closed, Honig and Brauser, acting with the knowledge and consent of Frost and others, had installed an associate, Elliot Maza ("Maza"), as the CFO and a director of the private BioZone.  After the merger, Maza became the CEO of public BioZone.  Thereafter, Maza sought approval from Honig and Brauser for every business decision.  For example, at the direction of Honig and Brauser, Maza agreed to divert funds from BioZone to pay rent for the office of an unrelated entity co-owned by Honig and Brauser.

64.     Following the reverse merger, Maza, and two Frost associates, Brian Keller ("Keller") and Roberto Prego-Novo ("Prego-Novo"), were the three board members of BioZone. In that capacity, they acted to conceal Honig and Brauser's control over BioZone by approving SEC filings that failed to disclose the involvement of Honig, Brauser, Stetson, and Groussman. These omissions made the filings materially misleading.  At the time of these filings, Keller, Prego-Novo, and Maza understood that Frost, Honig, and Brauser controlled BioZone's management instead of Maza, its CEO.  The SEC Complaint even quotes an email from Keller to a colleague from February 12, 2012, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece."  But the filings after the merger list only defendant Frost as a control person, not Honig or Brauser.

65.     Defendants Frost, Honig, and Brauser failed to keep their promises to invest money in BioZone's research and development.  Instead, in a series of PIPE financings, which included warrants for additional shares, between February 24 and March 12, 2012, they limited their investment to keep the business operating at a minimal level and to fund Maza and Keller's generous compensation, forcing BioZone to abandon its research and development efforts entirely by mid-2012.  Keller's compensation more than doubled once he began working with the Frost Pump-and-Dump Posse and Maza's annual compensation ranged from $300,000 to $600,000.

66.     Defendants Frost, Honig, and Brauser also used the PIPE financings to accumulate even more, even cheaper BioZone shares, and although the PIPEs did nothing to enhance BioZone's continued growth, Maza and Keller went along with them because both were promised, and ultimately awarded, substantial salaries as well as millions of BioZone shares, by its real control persons, which included defendants Frost, Honig, and Brauser.

67.     By April 1, 2013, and pursuant to an agreement to acquire, hold, or sell their shares in concert, defendants Frost, Honig, and Brauser, along with Maza, Keller, and the individuals associated with Frost, had amassed 44,818,312 shares, or almost 71% of BioZone's shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of BioZone's outstanding shares.  Yet, even though BioZone filed an amendment to its Form 10-K annual report for the 2012 fiscal year on September 13, 2013, signed by Maza, Keller, and Prego-Novo, for the specific purpose of updating the beneficial ownership table, the annual report failed to disclose the existence of the Frost Pump-and-Dump Posse, working in concert to beneficially own nearly three-quarters of BioZone's outstanding shares.

68.     On July 16, 2012, Daniel Fisher, BioZone's former CEO ("Fisher") – who had been ousted from the new company by Honig and Brauser with Keller's assistance – sued BioZone, Honig, Brauser, Maza, and Frost.  Brauser, who was not an officer or director of BioZone, took the lead in negotiating a settlement on behalf of Biozone, frequently updating Honig and Frost on his negotiations.  In September 2013, Brauser and Honig came to terms with Fisher, agreeing to pay him $2 million in return for his relinquishing his claim to the BioZone shares he had been promised in the merger, and that he had never received.  Maza then ratified the settlement terms on September 5, 2013 keeping the pump-and-dump scheme viable.

69.     During August and September 2013, in preparation for the BioZone pump-and-dump scheme, Stetson, at defendant Honig's direction, deposited in a brokerage account almost 4 million BioZone shares that had been issued to defendant Honig.  Stetson worked closely with Honig, Brauser, and Frost and knew how much BioZone stock they controlled, and that Honig and Brauser were directing BioZone's management and policies.  In connection with the deposit of Honig's shares, Stetson submitted Honig's signed answers to the broker's questionnaire,

falsely denying any relationship between Honig and BioZone or its affiliates.  At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of BioZone because it was under his control.

70.     On September 4, 2013, Stetson facilitated the issuance of false attorney opinion letters with the help of defendant Kesner to BioZone's transfer agent in order to remove restrictive legends from Honig's share certificates.  These opinion letters contained the material misrepresentation that Honig was not an affiliate of BioZone, which was false, given what they all knew about Honig's control over BioZone's management and polices.

71.     As part of the process of depositing Honig's shares with a broker, and in preparation for the pump and dump, BioZone's CEO, Maza, was also required to issue a letter to confirm the authenticity of the stock certificates.   In a letter to the broker-dealer, dated September 10, 2013 and quoted in the complaint in the SEC Action, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [BioZone] that would preclude Barry Honig from selling or otherwise disposing of shares represented above."  This statement was false because Honig was an affiliate of BioZone, and, as an affiliate, Honig's ability to sell his BioZone shares would be subject, under the federal securities laws, to volume limitations.

72.     Once the restrictions were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig directed his associate, defendant O'Rourke, to reach out to John H. Ford ("Ford"), a seasoned stock promoter who used his platform on *Seeking Alpha* to share his purportedly independent investment analysis of selected companies.  Defendant O'Rourke contacted Ford and proposed that Ford write a *Seeking Alpha* article promoting BioZone in exchange for below-market price

shares in the BioZone.  At that time, defendants Frost, Honig, Brauser, and O'Rourke, along with Stetson, Groussman, Keller, Maza, and Prego-Novo owned about 71% of the outstanding BioZone shares, and the market for BioZone was virtually nonexistent (with zero volume on September 20, 2013).  Defendant O'Rourke then instructed Ford to write a favorable article about BioZone emphasizing Frost's involvement (because Frost was known as the Warren Buffet of biotech) and the supposed rosy prospects of BioZone's research and development.

73.     On September 23, 2013, Honig and his associates began trading BioZone shares to create the appearance of market activity and interest in advance of the planned Ford article. That day, the trading volume of BioZone shares soared to 302,000 from zero the previous day.

74.     The pumped-up trading also gave Honig a way to secretly pay Ford for his upcoming favorable article on BioZone.  O'Rourke instructed Ford to put in buy orders for BioZone stock at $0.40 in order to ensure his order was executed against the corresponding sell order placed by Honig.  Honig then sold 180,000 BioZone shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded on that day.

75.     O'Rourke also traded in BioZone stock at the end of the trading day on September 23, 2013 to "mark the close," *i.e.*, to ensure that the last price of the day would be higher, giving the false impression that BioZone's share price was on an upward trajectory.  Specifically, at 3:58 pm, two minutes before the market closed, O'Rourke, through his entity ATG Capital LLC ("ATG"), placed a bid to buy BioZone shares at $0.68, a significantly higher price than the prior buy order at $0.55, which had been entered at about 3:06 pm.  Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

76.     In further preparation for the publication of Ford's glowing article about BioZone, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26, 2013, Honig and other members of the Frost Pump-and-Dump Posse and their related entities engaged in a series of coordinated trades.  For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold BioZone shares to a Honig associate at $0.68, and two minutes later Groussman's entity, Melechdavid, Inc. ("Melechdavid"), executed a transaction with the O'Rourke-controlled ATG at $0.68 per share.

77.     Less than half an hour before the market closed on September 26, 2013, as directed by O'Rourke and Honig, and after review by Keller, Ford published an article on *Seeking Alpha*, with the title "Opko and Its Billionaire CEO Invested in Biozone" that co-opted OPKO and defendant Frost's reputations to misleadingly pump up BioZone stock.  Ford presented a bullish outlook for BioZone and concluded that "Biozone should be trading for more than twice today's valuation."  Defendant Frost and the Frost Pump-and-Dump Posse clearly had no problem sullying OPKO's good name in this way.

78.     Ford's article also included an interview with Keller touting the benefits of BioZone's Qusomes technology.  Keller misleadingly stated that BioZone had a formulation ready for testing to be brought to the billion-dollar injectable drug market.  Yet, as Keller knew, by mid-2012, all research and development efforts had been shut down without the successful formulation of an injectable drug and BioZone had ceased all efforts to develop this technology.

79.     Ford's article failed to disclose that he had been compensated by Honig for writing the article in the form of Honig providing him with below-market BioZone shares on September 23, 2013.  Instead, Ford falsely included *Seeking Alpha*'s standard disclaimer:  "I am long BioZone.  I wrote this article myself, and it expresses my own opinions.  I am not receiving

compensation for it (other than from Seeking Alpha).  I have no business relationship with any company whose stock is mentioned in this article."

80.     The market reacted strongly to the BioZone promotion:  the trading volume of rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013.  The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.

81.     Once the stock was sufficiently pumped, the members of the Frost Pump-and-Dump Posse sold large quantities of shares at inflated prices for proceeds of approximately $9,260,000 between September 26, 2013 and December 31, 2013.  These sales were far in excess of the applicable volume limitations.

82.     Alpha Capital Anstalt ("Alpha") frequently co-invested in Honig's pump-and-dump schemes and participated in several rounds of BioZone PIPE financings.  As such, BioZone issued millions of shares to Alpha at severely discounted prices in January 2012, April 2013, and September 2013.  When Honig and Brauser settled with Fisher (BioZone's former CEO), by which Fisher disavowed his ownership in 6,650,000 shares to which he had been entitled, Alpha purchased 1.5 million of those shares at $0.15 per share, with the intention of selling the shares into the inflated market created at the peak of the pump-and-dump scheme. Biozone issued the shares to Alpha on September 23, 2013, days before the Ford article was published.  On October 29, 2013, Alpha obtained an attorney opinion letter that it supplied to BioZone's transfer agent, with the assistance of defendant Kesner, so that the transfer agent would remove the restrictive legend from the share certificate.  The attorney opinion letter falsely represented that Alpha had held the shares for at least six months and that the shares

could be sold in accordance with the Securities Act Rule 144 safe harbor, as exempt from the registration provisions.

83.     Between October 3, 2013 and November 18, 2013, Alpha, in lockstep with the Frost Pump-and-Dump Posse, sold 3.7 million BioZone shares for proceeds of $2,513,724, including virtually all of the shares Alpha had obtained in September 2013.  Between October 1 and 4, 2013, defendant Frost sold 1,987,991 BioZone shares for proceeds of approximately $1.1 million.

84.     Further, on December 31, 2013, OPKO owned approximately 16% of BioZone's equity.  On January 2, 2014, BioZone merged with CoCrystal Pharma, Inc. ("CoCrystal"), a privately-held entity in which OPKO had substantially invested since September 2009 and Frost, Hsiao, and Rubin had been directors since 2008.  All three are still on the CoCrystal board.

85.     The BioZone pump-and-dump scheme has resulted in the filing of a securities fraud class action, captioned *Pepe v. Cocrystal Pharma, Inc. f/k/a BioZone Pharmaceuticals, Inc., et al.*, Case No. 2:18-cv-14091, pending in the United States District Court for the District of New Jersey.  Among others, Frost, Honig, Brauser, and O'Rourke are named as defendants in the action.  Since its CEO, Chairman, and controlling stockholder Frost is named as a defendant, OPKO will be forced to expend monies to comply with document production requests and produce witnesses in this action and may be added as a party at a later date.

86.     Involvement in this scheme alone would have been enough to sully OPKO's good name and deeply harm the Company, but there were several other schemes carried out by the Frost Pump-and-Dump Posse with the assistance or acquiescence of the OPKO Individual Defendants and Frost Entities that have dragged OPKO down even further.

87.     Even after the primary BioZone pump-and-dump scheme, the OPKO Individual Defendants have continued to cause the Company to engage in self-dealing related-party transactions with BioZone/CoCrystal.   On January 16, 2014, OPKO invested an additional $500,000 in CoCrystal as part of a $2.75 million private placement and received one million shares of common stock and one million 10-year warrants exercisable at $0.50 per share.  As of March 2015, OPKO held an 8% ownership stake in CoCrystal and that amount went up to 9% as of OPKO's 2017 10-K.

## 2.  The MGT Pump-and-Dump Scheme

88.     In 2015 and 2016, the Frost Pump-and-Dump Posse used MGT Capital Investments, Inc. ("MGT"), a publicly-traded shell company, as another vehicle for a pump-and-dump scheme.   The Frost Pump-and-Dump Posse used many of the same tactics they had employed in the BioZone scheme:  they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.  Despite their control over various actions taken by MGT, and their agreement to buy, hold, and/or sell their shares in concert, the Frost Pump-and-Dump Posse – with traders including Brauser and O'Rourke – took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO, Robert B. Ladd ("Ladd").

89.     In 2015, the Frost Pump-and-Dump Posse began planning the pumping and dumping of MGT's shares.  Honig set the scheme in motion on September 26, 2015, when he informed Stetson, in an email reproduced in the SEC Complaint, that "[w]e need to put together a term sheet for MGT," and outlined proposed terms of the arrangement.  Honig directed Stetson to send the proposal to MGT's CEO Ladd.  The deal contemplated the issuance of 2.8 million

MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker.  This deal structure allowed the Frost Pump-and-Dump Posse to repeatedly convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings.  By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, the Frost Pump-and-Dump Posse increased the likelihood that they could disguise their scheme to pump up the price of MGT's shares in anticipation of a profitable sell-off to unsuspecting investors.

90.    MGT's CEO Ladd was fully aware of the Frost Pump-and-Dump Posse's combined interest in, and control over, MGT, but was coerced by the Frost Pump-and-Dump Posse not to disclose it in MGT's public filings.  An October 1, 2015 email reproduced in the SEC Complaint from Ladd to Honig states that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ."  Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an LLC created by Stetson]."  On October 5, 2015, Stetson provided MGT with the investors who would participate in the financing, which included GRQ Consultants, Inc. ("GRQ") (controlled by Honig), Melechdavid (controlled by Groussman), Grander Holdings, Inc. ("Grander") (controlled by Brauser), ATG (controlled by O'Rourke), and Stetson Capital Investments Inc. ("SCI") (controlled by Stetson).

91.    The Honig-led financing ultimately provided $700,000 to MGT and, on October 8, 2015, MGT filed a Form 8-K with the SEC disclosing that it had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . ."  In keeping with Honig's desire to conceal the large ownership stake of

his team, Ladd did not disclose the investors' names in the Form 8-K.  Those secret names included several members of the Frost Pump-and-Dump Posse.

92.     After coordinating the accumulation of stock with O'Rourke, Brauser, Groussman, and Stetson, Honig, with the knowledge and consent of the Frost Pump-and-Dump Posse, then secretly paid for a promotion of MGT that included materially misleading information and was supported by his own manipulative trading activity.   After Honig, Groussman, Brauser, Stetson, and O'Rourke had acquired at least 16.3% of MGT's outstanding stock, around January 21, 2016, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of MGT.  Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting MGT's positive prospects in social and real money gaming sites and intellectual property relating to slot machines.  The article did not disclose that the author had been paid by MGT – at Honig's direction – to write the article.  After the article was published on February 3, 2016, there was a 7,000% increase from the previous day's trading volume, and an intraday price increase of over 60%.  Honig, O'Rourke, Ladd, and Stetson sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

93.     Honig next identified a potential acquisition target for MGT that would give him and the Frost Pump-and-Dump Posse another way to profit from their interest in MGT.  The proposed deal involved a well-known cybersecurity innovator, John McAfee ("McAfee"), who had created a popular antivirus software bearing his name.  O'Rourke took the lead at Honig's direction (and with the knowledge and consent of the other members of the Frost Pump-and-Dump Posse) in arranging a deal between MGT and McAfee.  On March 29, 2016, O'Rourke sent McAfee a term sheet for the asset purchase of McAfee's company, D-Vasive Inc. ("D-

Vasive") by an "NYSE listed company." D-Vasive indicated interest on April 3, 2016. O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he still wanted to pursue the deal. Honig replied, "Yea!", that same day and O'Rourke introduced Ladd to McAfee on April 4, 2016, to begin negotiating a transaction between MGT and McAfee's various business interests.

94. Subsequent correspondence reproduced in the SEC Complaint between Ladd and O'Rourke and between O'Rourke and Honig, reflects the ongoing and significant role Honig and O'Rourke played in orchestrating the MGT pump and dump. MGT and McAfee agreed to terms on May 8, 2016. Then, on May 9, 2016, at 8:30 am, MTG issued a press release announcing its merger with D-Vasive. In the press release, Ladd misleadingly described McAfee's prior financial success. He falsely claimed that McAfee had "sold his anti-virus company to Intel for $7.6 billion," suggesting that MGT might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of McAfee's namesake company to Intel at that price had occurred over a decade after McAfee's departure.

95. With knowledge that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in MGT stock to create the misleading appearance of market liquidity. In pre-market trading that morning, Honig bought and sold small quantities of MGT stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussman, and his entity Melechdavid, engaged in coordinated trades in MGT with Honig in pre-market trading.

96. That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author, titled "MGT Capital Beastmode engaged – John McAfee driving the Bus." The article touted MGT and highlighted McAfee's involvement,

repeating Ladd's materially false claim that MGT had "sold his startup company to Intel for $7.6BB," and proclaiming:  "This is big big big!"

97.     This promotional article and Honig, Brauser, and Groussman's manipulative trading on May 9, 2016 were effective in driving up both volume and price.  On May 6, 2016 (the last day of trading prior to the promotion), MGT had trading volume of 71,005 shares and a closing price of $0.36.  On May 9, 2016, the stock closed at $0.49 (representing an increase of 34% over the prior day's close) with trading volume of more than 10 million shares.  The trading volume for MGT stock peaked at 109,384,614 on May 17, 2016 with a closing price of $4.15.

98.     In the days immediately following the announcement of D-Vasive acquisition, Honig, Brauser, Stetson, Groussman, and O'Rourke, pursuant to their agreement to buy, hold, and/or sell their shares in concert, sold over 9.3 million MGT shares, resulting in total proceeds of over $9.4 million.

99.     Although they were acting in concert, pursuant to an agreement to do so, Frost Honig, Brauser, Stetson, Groussman, and O'Rourke concealed their concerted efforts from the investing public.   Ladd, with full knowledge of both the Frost Pump-and-Dump Posse's ownership and their direction of the management and policies of MGT, also kept their control a secret, signing MGT public filings that did not disclose the full extent of their ownership or control.  After the October 2015 MGT financing closed, Honig, Groussman, Brauser, Stetson, and O'Rourke as a group collectively owned at least 2.6 million shares, or over 16% of the shares outstanding after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015.  Moreover, they each had warrants to obtain a total of an additional 4.6 million MGT shares, which, if they were all converted, would have

resulted in Honig, Groussman, Brauser, Stetson, and O'Rourke controlling at least 42% of the total common shares outstanding at that time.

100.    Honig, O'Rourke, Brauser, Groussman, and Stetson exercised control over Ladd and the management and policies of MGT.  For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose the Frost Pump-and-Dump Posse's stock acquisitions to the NYSE MKT exchange.  O'Rourke, at Honig's direction, negotiated on MGT's behalf the terms on which McAfee would sell D-Vasive to MGT.  Indeed, in emails after the D-Vasive acquisition, Honig freely accepted credit for his role in the transaction.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction:   "You're invovlved [sic] with [MGT]?  Impressive!"  Honig responded that he was the "[l]argest shareholder, fund and relationship with [McAfee]."  In early August 2016, Honig also admitted his undisclosed role at MGT in a chat conversation with Stetson:  "its great in [MGT] because we are behind the scenes."

101.    Because they acted in concert for the purpose of acquiring, holding, and disposing of MGT shares, each of Honig, Brauser, O'Rourke, Stetson, and Groussman was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, neither Honig, Brauser, O'Rourke, Groussman, nor Stetson ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of the Frost Pump-and-Dump Posse's position and their coordination, thereby deceiving investors.

102.    Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – which he knew to be false.    Indeed, because Honig and the Frost Pump-and-Dump Posse exercised control over MGT's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.  Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity, Grander.  In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

103.    Similarly, in MGT's 2015 Form 10-K, filed with the SEC on April 11, 2016, only Honig was disclosed as a beneficial owner, with holdings of 8.6%.  Notwithstanding that Ladd knew that Honig, O'Rourke, Brauser, Stetson, and Groussman were working together, he signed the 2015 Form 10-K failing to disclose their group beneficial ownership.  Ladd also signed a materially misleading S-1/A registration statement, filed with the SEC on January 13, 2016, for the 8,400,000 MGT shares issued in the October 2015 MGT financing, failing to disclose the group beneficial ownership of the Frost Pump-and-Dump Posse related entities:  GRQ, Grander, Melechdavid, ATG, and SCI.

104.    The MGT pump-and-dump scheme has resulted in the filing of two securities fraud class actions, one pending in the United States District Court for the District of New Jersey, captioned *Klingberg v. MGT Capital Investments, Inc., et al.*, Case No. 2:18-cv-14380, and one pending in the United States District Court for the Southern District of New York,

captioned *Guyer v. MGT Capital Investments, Inc., et al.*, Case No. 1:18-cv-9228. Among others, Honig, Brauser, and O'Rourke are named as defendants in both actions. OPKO and defendant Frost will likely be forced to expend monies to comply with document productions and serve at witnesses in these actions and may be added as parties at a later date.

105.     While the SEC Complaint does not directly implicate OPKO or Frost in the MGT scheme, it was part of the series of schemes carried out by the Frost Pump-and-Dump Posse that led to enhanced regulatory scrutiny and helped tip regulators off as to OPKO's improper conduct.

### 3.   The MabVax Pump-and-Dump Scheme

106.     In early 2014, Honig identified MabVax Therapeutics Holdings, Inc. ("MabVax"), a publicly-traded shell company that was unencumbered by debt, and sought an appropriate private company for the purpose of a reverse merger and pump-and-dump scheme.

107.     Around the same time, the CEO of Telik, Inc. ("Telik") was introduced to Hudson Bay IP Opportunities Master Fund L.P. ("HB Fund")[2] a frequent co-investor alongside Honig and Brauser. At the time, Telik, a private company developing cancer therapies and diagnostic products, was looking for funding for its research and development efforts, and HB Fund suggested to Telik's CEO that he turn Telik into a public company. On July 8, 2014, Telik executed a reverse merger of Telik into MabVax, the shell company that Honig had identified. Telik's CEO understood that the two lead investors in the transaction were HB Fund and HS Contrarian Investments, LLC ("HSCI"), both of which had signed the deal documents. Stetson had described HSCI to Telik's CEO as his own investment vehicle. In fact, while Stetson was

---

[2]  The SEC Complaint only refers to HB Fund as "Entity H," but the complaint in the MabVax securities class action reveals it to be HB Fund.

the sole managing member of HSCI, Honig owned at least 94% of HSCI with Frost and Brauser owning the remainder, facts that Stetson did not disclose to Telik's CEO or the investing public.

108.    In an initial $3 million capital raise in February 2014, in connection with the contemplated merger, Honig, Frost, and Brauser's HSCI invested $1 million and HB Fund invested $1.7 million in return for a substantial position in MabVax.  As a result, the stake of HB Fund and HSCI (including conversion of all warrants) amounted to about 67% of the authorized shares of the newly-public combined company, MabVax.  The terms of the merger included granting a "Consent Right" to HB Fund and its affiliates, by which HB Fund could block or approve many kinds of MabVax transactions, including issuing additional shares, any change of control and other basic corporate actions.

109.    In March and April 2015, Honig orchestrated two private placement financings for MabVax:  Series D and Series E.  Honig determined the amount, source and structure of, and participants in, these financings.  For example, when deciding whether a potential investor could take part in the March 2015 financing round, MabVax's CEO, J. David Hansen ("Hansen") explicitly deferred to Honig, writing in a March 19,2015 email to Honig reproduced in the SEC Complaint, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."

110.    The Series D financing closed in late March 2015 and included a buyout of HB Fund's notes, including the Consent Right, at a favorable purchase price.  The investors who purchased the notes included various entities owned and controlled by Frost, Honig, Stetson, O'Rourke, Brauser, and Groussman:   HSCI, Southern Biotech, GRQ, ATG, Grander, and Melechdavid.

111.    The Series E financing, which closed Apri16, 2015, included warrants, and raised $12 million for MabVax on terms highly favorable to Honig and his chosen investors, including Frost's entities:  FGIT, OPKO, and Southern Biotech.  OPKO invested $2.5 million in exchange for 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchased 1,666,667 shares of MabVax common stock.   In connection with this investment, defendant Rubin was appointed as an advisor to MabVax and OPKO received the right to designate two MabVax directors.

112.    One of the goals of the private placement financings, as Frost, Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman knew, was to generate market interest in MabVax stock in preparation for a planned stock promotion.   On April 3, 2015, O'Rourke, acting at Honig's direction, drafted a press release (with input from Hansen, Honig, and Brauser) announcing the $12 million private placement in which Frost's entities, FGIT, Southern Biotech, and OPKO had participated.  Honig then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on *Seeking Alpha* on April 8, 2015 at 11:13 a.m.  The article, titled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics," touted Frost's good name and highlighted OPKO and Frost's investment in MabVax.   Despite his involvement in facilitating the MabVax financing and his extensive business relationships with Frost, Honig, Stetson, and Brauser, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with MabVax." He also falsely claimed that he was "not receiving compensation for [writing the article]."

113.    Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG, Melechdavid, and O'Rourke engaged in early trading of MabVax shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock.   That trading included at least one

matched trade, with Melechdavid submitting the buy order and ATG submitting the sell order for the same price, at 9:38 a.m.  MabVax's share price opened that day at $3.14 and reached $3.73 in the minutes before the promotion was released.

114.    The promotion was successful.  The trading volume of MabVax shares rose almost 7,500% from 8,833 shares on Apri12, 2015 to 667,454 shares on Apri16, 2015, following the announcement of the Series E private placement.  The volume increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published.  MabVax's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015.  The Frost Pump-and-Dump Posse, acting pursuant to their agreement to buy, hold, and/or sell their MabVax shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

115.    In June 2015, when the market for MabVax shares had cooled, O'Rourke recruited Ford to publish an article praising MabVax on Ford's blog and *Seeking Alpha*.  On July 1, 2015, Ford published an article, titled "MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5."  The article contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were in early stages.  Honig again compensated Ford for writing the blog post, and Ford again did not disclose that he had been paid.

116.    Ford's article had the desired impact on the market:  MabVax trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015.  Likewise, MabVax's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to buy, hold, and/or sell their shares in concert, the Frost

Pump-and-Dump Posse sold shares into the market from July 1, 2015 to December 31, 2015 for proceeds of over $2.7 million.

117.    Honig continued to invest in MabVax and directed critical business choices for MabVax.  For example, on more than one occasion, Honig directed MabVax's CEO, Hansen, to name Honig's choice to MabVax's board.  On January 15, 2015, Honig decided that MabVax needed to employ different attorneys and shortly thereafter directed MabVax's CEO to retain specified counsel in connection with MabVax's corporate filings.  In July 2015, OPKO invested an additional $375,000 in exchange for 340,909 shares of MabVax common stock valued at $1.10 per share and 170,454 warrants to purchase shares of MabVax common stock.  On August 15, 2016, at Honig and Stetson's direction, as a condition to HSCI providing additional financing to MabVax, HSCI and MabVax's CEO executed a letter agreement requiring MabVax to hire the public relations firm that Honig and Stetson had selected.

118.    Given the agreement among Frost, Honig, Brauser, Groussman, Stetson, and O'Rourke to buy, hold, and/or sell their MabVax shares in concert; the group's direction of MabVax management and policies; and their combined share ownership, all of the members of the Frost Pump-and-Dump Posse were required to make Schedule 13D filings that they did not make.  They did not make the appropriate filings so that the investing public would not discover their control over MabVax, and to obscure from investors their planned pump-and-dump scheme.

119.    Stetson and HSCI were obligated to make a Schedule 13D filing as of July 2014, after MabVax became a public company and they acquired beneficial ownership of more than 5% of MabVax shares.  Similarly, as of the closing of the private placement financings in April 2015, Groussman (Melechdavid) and O'Rourke (ATG) were each obligated to make a Schedule 13D filing, disclosing their own respective holdings and that each was a member of the group

because they were acting with one another and with Frost, Stetson, and Honig for the purpose of acquiring, holding, or disposing of MabVax shares, and collectively owned greater than 5% of MabVax's outstanding shares.

120.    Even though Frost and FGIT acquired the MabVax shares with an intention to control management, Frost and FGIT made a Schedule 13G filing on April 10, 2015 incorrectly indicating that they were passive investors.  Moreover, the Schedule 13G stated that Frost and FGIT had a 6.86% ownership percentage, but did not disclose they were working with Honig, Stetson, O'Rourke, Brauser, and Groussman, and that they, with the other members of the Frost Pump-and-Dump Posse, sought to direct and control management.  Nor did Frost file a Schedule 13D for OPKO or Southern Biotech, in which those companies should have disclosed both their own holdings and that they, too, were each a member of the group.  Instead, Frost improperly made four Schedule 13G/A filings on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, respectively, ignoring the fact that he was ineligible to file a Schedule 13G because he was not a passive investor.

121.    Other members of the Frost Pump-and-Dump Posse who invested in MabVax also improperly made Schedule 13G filings, notwithstanding that these members were not passive investors, and also failed to disclose their membership in the group, in violation of an express disclosure requirement.  For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017 disclosing only his 5.64% ownership through HSCI; and Brauser filed a Schedule 13G on February 2, 2017 disclosing only his 5.44% ownership through Grander.  Each of these members of the Frost Pump-and-Dump Posse should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of a group.

Additionally, a Schedule 13D filed by Stetson on February 12, 2018, a Schedule 13D filed by Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 also failed to disclose the existence of a group.

122.    The MabVax pump-and-dump scheme has resulted in the filing of a securities fraud class action in the United States District Court for the Southern District of California, captioned *In re MabVax Therapeutics Securities Litigation*, Case No. 3:18-cv-1160.  Among others, Honig, O'Rourke, Brauser, OPKO, Southern Biotech, and FGIT were named as defendants in the MabVax securities class action.  MabVax also filed suit on September 11, 2018 against defendant Kesner and his former law firm for negligent professional practice, breach of fiduciary duty, breach of contract, unjust enrichment, deceit, and fraud.  The suit is pending in the Superior Court of California, San Diego County, captioned *MabVax Therapeutics Holdings, Inc. v. Sichenzia Ross Ference LLP, et al.*, Case No. 37-2018-00045609-CU-PN-CTL.

123.    Even after the primary MabVax pump-and-dump scheme, the OPKO Individual Defendants have continued to cause the Company to engage in self-dealing related-party transactions with MabVax.  In July 2017, OPKO invested an additional $100,000 for 152,143 shares of MabVax common stock and as of December 31, 2017, OPKO and Frost owned 4% and 10.56% of MabVax, respectively.

## C.    Additional Schemes Carried Out By the Frost Pump-and-Dump Posse

### 1.    The Riot Blockchain Pump-and-Dump Scheme

124.    In addition to those described in the SEC Complaint, the Frost Pump-and-Dump Posse also engaged in a pump-and-dump scheme involving Riot Blockchain, Inc. ("Riot").

125.    Riot is the fifth iteration of a biotechnology company that initially developed and manufactured diagnostic machinery and products ranging from in-vitro diagnostics to veterinary care.  In November 2016, Riot, then named Venaxis, acquired Bioptix, Inc. ("Bioptix") and,

effective December 1, 2016, changed its name to Bioptix.   Shortly thereafter, Honig began positioning himself and the Frost Pump-and-Dump Posse to take control of the Company.  Honig acquired a significant stake in Bioptix and moved quickly to successfully replace the existing board members with candidates of his choosing, including O'Rourke.

126.    After Honig and the Frost Pump-and-Dump Posse gained control over the Bioptix in late 2017, they began to make a number of fateful changes to the company and its business structure.   The catalyst for these changes was the sudden popularity and success of cryptocurrencies.   Throughout 2017, cryptocurrencies like Bitcoin experienced an incredible price surge – Bitcoin experienced an exponential leap in price from less than $1,000 per coin at the beginning of 2017 to nearly $20,000 per coin in mid-December 2017.   In an effort to capitalize on the enormous profits generated by the cryptocurrency wave, Honig and the Frost Pump-and-Dump Posse suddenly shifted Bioptix's entire business structure.

127.    In October 2017, Bioptix announced it was changing its name to Riot Blockchain, Inc. and pivoting to become a leader in blockchain technology.  Honig immediately made Riot begin to represent to the investing public that its transition to the cryptocurrency industry was an undeniable success.

128.    The timing was perfect, as investors rode the rising wave of Bitcoin through November and December of 2017.  Riot's share price reflected this strong market confidence, increasing from just $8.09 per share on October 3, 2017, to $38.60 – a staggering increase of over 377% in only two months.

129.    However, it was not long before the truth came to light.  Far from a well-seasoned leader in blockchain technologies, Riot was merely a vehicle for the sole purpose of facilitating the Frost Pump-and-Dump Posse's access to the lucrative cryptocurrency market.

130.    On February 16, 2018, *CNBC* published an in-depth report which made it clear that Riot's blockchain business was not what it seemed.  The investigation raised a number of red flags, including, *inter alia*:   (i) Riot had no real involvement with the cryptocurrency or blockchain business; (ii) its name change and business plan pivot were suspicious and likely to attract SEC scrutiny; (iii) insiders had sold substantial amounts of personally-held stock at suspicious times; and (iv) the relationships between some of Riot's officers and directors and defendant Honig were cause for concern.

131.    The market reaction was immediate:  Riot stock plummeted from $17.20 per share on February 15, 2018, to $11.46 on February 16, 2018, representing a market capitalization loss of over $66 million in one day.

132.    Having lost the faith and goodwill of the public, Riot's share price has continued to decline since February 2018.  Riot is now also subjected to extensive litigation for which it may have to pay hundreds of millions of dollars, including a securities fraud class action pending in the United States District Court for the District of New Jersey, captioned *Takata v. Riot Blockchain, Inc., et al.*, Case No. 3:18-cv-2293.   Among others, O'Rourke is named as a defendant in the Riot securities class action.  OPKO and defendant Frost will likely be forced to expend monies to comply with document productions and produce or serve as witnesses in this action and may be added as parties at a later date

133.    Even as Riot is suffering financially and otherwise, Honig, O'Rourke, and other members of the Frost Pump-and-Dump Posse have come out fiscally unscathed.  They received more than $18 million in proceeds from their sales of Riot stock based on insider information.  Others profited handsomely from their positions controlling Riot, in the form of compensation and other fees.

### 2. The VBI Vaccines Pump-and-Dump Scheme

134.    Another scheme involving the Frost Pump-and-Dump Posse – which was not part of the SEC Complaint but bears a striking resemblance – involved VBI Vaccines, Inc. ("VBI").

135.    In early 2015, defendant Frost approached leadership at VBI looking to orchestrate a merger with SciVac Ltd ("SciVac").  According to OPKO's Form 10-K for 2015 filed with the SEC (the "2015 10-K"), OPKO had acquired a 50% ownership in SciVac in June 2012.

136.    By late April 2015, defendants Frost and Rubin had met with VBI's board and management concerning the merger.  Rubin served on the SciVac board and was involved with several other Frost-controlled companies.  Frost and his associates sold VBI on the idea that the merger would provide access to the funds and personnel associated with SciVac.

137.    In the period just prior to the merger, defendants Honig and Brauser acquired shares of SciVac.  As of July 2015, Honig beneficially owned 72,870,480 shares of SciVac stock, representing 9.6%, and Brauser beneficially owned 61,183,738 shares, representing 8.1%.  On July 9, 2015, SciVac completed the reverse merger and OPKO's ownership in the new company, decreased to 24.5%.  On October 26, 2015, the merger was announced to the public and at that point OPKO owned approximately 16.6% of the combined company, named VBI.

138.    Following the October 26, 2015 public announcement of the merger, the Frost Pump-and-Dump Posse carried out coordinated schemes to boost the stock price of VBI.  This, of course, included promotional articles written by the same authors as the schemes included SEC Complaint.  One example is a paid article posted on *Biotechstocks.com*, titled "A Merger Involving Two Pioneering Biotech Titans Just Happened & It Doesn't End There!", which highlighted Frost's involvement and his excellent track record.  In exchange for publishing the

article, BiotechStocks.com was paid $30,000 "for visual sponsorship on BiotechStocks.com and for visual placement of VBIV. [sic] within written materials."

139.   Additional articles were published in July 2016, each encouraging investors to have a bullish outlook on VBI based on Frost and OPKO's involvement.  One author, Samuel Rae, posted 26 separate articles across five platforms, another, Mark Holder, published five separate articles on two platforms, and a third, Christopher Malcolm, published six separate articles on four platforms.  Each of these articles was paid for or induced by the Frost Pump-and-Dump Posse and each of the three authors also published similar articles about MabVax.

**3.   The PolarityTE False Marketing Scheme**

140.   PolarityTE, Inc. ("PolarityTE") is another company with a myriad of ties to defendant Frost and the Frost Pump-and-Dump Posse that has recently been the subject of litigation for being less than forthcoming to investors.

141.   PolarityTE completed a merger wherein it acquired what it publicly stated was a valuable patent.  In truth, the patent had been rejected one week prior to the closing of the transaction.  Despite this fact, PolarityTE stock has been misleadingly hyped to investors.  On August 8, 2017, Jeff Dyer, a PolarityTE director, contributed to a *Forbes* article, titled "PolarityTE:  Will This Biotech Be the Next Amazon or Tesla?"  Dyer stated that PolarityTE would be the next breakthrough biotech company, in large part because of the involvement of defendant Frost and his sterling reputation:

> PolarityTE's technology – if it works – will be extremely disruptive to incumbents . . .  Despite the promise of PolarityTE's technology, Lough and Swanson would likely never have resigned from Hopkins to pursue the venture without an innovative financing model . . . ***Enter billionaire investor Philip Frost and his investment team.  In the biotech sector, and especially in small cap ventures, there is no bigger name than Dr. Philip Frost.  Across a career spanning over 40 years, Frost has built a net worth over 4 billion dollars, the vast majority of which derives from founding, buying, selling, and investing in biotechnology companies.  Frost and his team are well known for using a***

*"reverse-merger" approach where they use a dying public company (in this case Majesco, a game publisher) as a public shell company to offer a promising private entity (in this case PolarityTE) a route to the public markets and – by proxy – access to cheap public capital.  His very own, OPKO Health (Ticker: OPK), was formed in 2007 by merging Acuity Pharmaceuticals and Froptix, both privately owned pharmaceutical companies developing treatments for eye diseases into eXegenics, a shell company with $16 million in cash.  As part of the merger, The Frost Group provided an additional $12 million line of credit. Today, OPKO is a multibillion dollar multi-national pharmaceutical and diagnostics company built up through acquisitions.  Dr. Frost has been the CEO and Chairman of the Company since March 2007.*

(Emphasis added).

142.    The article goes on to tout how Frost, Honig, and other members of the Frost Pump-and-Dump Posse are an "All-Star Team," as follows:

**Sidebar: Why Polarity Can Recruit An All-Star Team**

Why will someone leave a secure job in the medical field to join a start-up?  One reason, of course, is because the work and opportunity is perceived to be intrinsically interesting.  But for most, it comes down to simple math:  what is the probability that the venture will successfully create value X (times) what is my share of that value?  Put simply, PolarityTE can offer more equity to induce talent to join the team because the founders have more to give.  Compared to VC-backed biotech firms, Lough has 5-10 times the equity to share with talent – which explains, in part, why he's been able to quickly recruit a half dozen key individuals with MDs or Ph.Ds from Johns Hopkins and other top medical institutions.

*             *             *

*Since 2014 Frost, along with co-investor Barry Honig, have used the reverse merger process multiple times with life science companies including SciVac now VBI Vaccines, Inc. (NASDAQ:VBIV) and CoCrystal Pharma Inc. (OTCBB:COCP).  As it turns out, this financing model can be very attractive for both biotech founders and investors.  For starters, it gives the founders control of the company and they don't have to report to VCs – folks who have a reputation for focusing on short term financial gains and early exit strategies to the exclusion of long term innovation.  As a public company with patient major shareholders like Frost and Honig, the company can go after home runs in the field of regenerative medicine.*  Instead of focusing on an exit strategy for the VC's investment and Limited Partners, PolarityTE has essentially already achieved that goal as a public company, with every new investor enjoying the benefits of liquid capital, but at the same time having the enormous upside of a brand-new biotech company with numerous value inflection points ahead of them

(e.g., human proof of concept, market entry, and revenue growth).  Given the company's upside, it's not surprising that PolarityTE's stock has increased by a factor of seven – from $3 to over $20 in the first six months.

*Beyond control, launching a new biotech company through a public merger immediately gives the company access to a whole new breed of investors who move quickly and spread the story.  As Lough recalls, "Frost and Honig dropped a term sheet on us 24 hours after initiating discussions – a welcomed pace after enduring multiple rounds of VC due diligence that takes 4-5 months before anyone puts numbers in writing.  Because of their vast experience in biotech, they quickly understood the potential value of our technology."  Aside from the equity and control benefits that the deal structure provided, when you ask the founders what was so attractive about this structure, you hear a calculated confidence that is sure to make any investor feel even more comfortable*.  "This deal immediately allowed us to put our money where our mouth was," said Swanson.  "After pursuing multiple deal structures with private investors, debating our valuation became tiring, which in the private markets in a pre-revenue pre-clinical biotech company is almost entirely imaginary.  Taking our company public out of the gates gives us the opportunity to tangibly prove to the world what we're worth because the capital markets will give us that answer daily."  Lough and Swanson claim that the cost of capital (in terms of equity they had to give up) through this process was less than half of what it would have been using VCs.  Of course, many startup companies with no prior funding would shy away from a public launch because of the pressure and responsibility it demands.  "We know we have the goods and we jumped at the opportunity to demonstrate it," claims Swanson.  "Perhaps this model of funding startups can weed out the weak investments faster than VCs are able to, which can explain the drastically different timetables between the two types of investors."

Lough and Swanson's willingness to leave their residencies and go public was an important signal to Frost and Honig that PolarityTE was worth the investment.  *"Reverse mergers provide a seamless process for getting a company public," says Frost.  "If done properly, it is faster and cheaper than an IPO.  As a Dermatologist and an investor for over 50 years, I have seen countless regenerative medicine technologies that have failed.  The technology and initial results seen by Polarity has the potential to transform the regenerative medicine landscape.  This structure has allowed Polarity to launch their trials and get into commercialization much quicker than a traditional IPO."  While the public merger model lowers the cost of capital for biotech founders and inventors, it is also a boon to early investors like Frost and Honig.  Based upon our analysis of five public reverse merger deals they've done in the biotech space since 2014 (including PolarityTE), their average annual return on these deals is more than 175%*.  Any VC would be thrilled with these returns.  But this type of investing is not for the faint of heart as not all deals have been successful. Betting on new life science technologies is risky – and requires a portfolio approach.  The bottom line is that the public reverse-merger structure can work extremely well for both smart portfolio investors and biotech inventors.  It gives founders the financial incentive

(i.e., equity) to walk away from their careers and lead new ventures; and it gives smart investors great returns.   And while the jury is still out, PolarityTE represents an interesting test case as a pioneering new model for biotech innovations, inventors, and investors.

143.    The false and misleading statements regarding PolarityTE align perfectly with the strategies employed in the other schemes and have subjected it to a securities fraud class action pending in the United States District Court for the District of Utah, captioned *In re PolarityTE, Inc. Securities Litigation*, Case No. 2:18-cv-510.  While OPKO and Frost are not defendants in the lawsuit, they will likely be forced to expend monies to comply with document productions and produce or serve as witnesses in the action and may be added as parties at a later date.

**D.    The OPKO Individual Defendants Cause OPKO to Issue a Series of Materially False and Misleading Statements**

144.    As described in the SEC Complaint, defendants Frost, Honig, O'Rourke, and Brauser were involved in paying to have false and misleading articles published in investor publications that promoted investments by OPKO in order to artificially inflate the prices of the target companies' securities as part of their pump-and-dump schemes.  These articles touted the involvement of Frost and OPKO in order to generate investor enthusiasm for the target companies' securities and thereby drive up the prices of those companies' securities so that Frost and the Frost Pump-and-Dump Posse could sell their own holdings at artificially-inflated prices. These articles were issued with the understanding that they would not disclose the compensation being paid to the articles' authors and would conceal the authors' connection to the pump-and-dump schemes laid out in the SEC Action and other pending litigation described above.

145.    All the while, OPKO actually invested in each of the target companies and those actual investments took place due to actions by the OPKO Individual Defendants.  These defendants knew that OPKO had invested in failing shell companies and other vehicles that were

set up to only be used in pump-and-dump schemes and not truly succeed, yet allowed the investments to move forward and OPKO's good name to be dragged through the mud.

146. On September 26, 2013, the Frost Pump-and-Dump Posse, with the approval or acquiescence of the OPKO Individual Defendants, caused the publication of the *Seeking Alpha* article "OPKO and its Billionaire CEO Invested in Biozone." The article promoted the stock of Biozone by citing defendant Frost's ownership based on his reputation as a savvy investor in biotech companies. The article included a statement that Ford, the author, was not compensated for the article (other than from *Seeking Alpha*). As revealed in the SEC Complaint, however, Ford had been compensated by Honig, in association with the Frost Pump-and-Dump Posse, to write the article.

147. On November 12, 2013, the OPKO Individual Defendants caused the Company to file a quarterly report for the third quarter of 2013 with the SEC (the "3Q 2013 10-Q"). The 3Q 2013 10-Q highlighted the importance of defendant Frost to OPKO's business but failed to disclose his participation in the pump-and-dump schemes outlined herein, stating: "The loss of Phillip Frost, M.D., our Chairman and Chief Executive Officer, could have a material adverse effect on our business and product development." The 3Q 2013 10-Q also discussed the Company's investment in BioZone, but made no mention of Frost's role in the pump and dump scheme, stating, *inter alia*:

> In February 2012, we purchased from BZNE $1.7 million of 10% secured convertible promissory notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal to $0.20 per common share, which BZNE Notes are due and payable on February 24, 2014 and ten year warrants to purchase 8.5 million shares of BZNE common stock at an exercise price of $0.40 per share.

148. The 3Q 2013 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Frost and Rodriguez attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

149.   On November 13, 2013, Ford published another article regarding BioZone on *Seeking Alpha*, titled "BioZone Update."   The article again highlighted defendants Frost and OPKO's investments in BioZone.   Ford stated that defendants Frost and OPKO had orchestrated a recent transaction with nutritional supplement company, MusclePharm Corp. ("MusclePharm"), in order to prepare BioZone "for some type of significant valuation enhancement."   Ford had previously published an article in *Seeking Alpha*, titled "Opko's Billionaire CEO Invests In MusclePharm," in which he stated that investors should "take a look at one of Dr. Frost's newest investments, MusclePharm," which "could provide investors with at least a 3 times return."   Neither article disclosed Ford's participation, or compensation, in the pump-and-dump schemes described in the SEC Complaint.

150.   On March 3, 2014, the OPKO Individual Defendants caused the Company to file a Form 10-K for 2013 with the SEC (the "2013 10-K"), which provided the Company's full year 2013 financial results.   The 2013 10-K highlighted the importance of defendant Frost to OPKO's business, again stating: "The loss of Phillip Frost, M.D., our Chairman and Chief Executive Officer, could have a material adverse effect on our business and product development."   The 2013 10-K similarly stated: "Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D."   The 2013 10-K continued by highlighting defendant Frost's reputation as material to the Company's business and continued financial success, as follows:

> Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon

our business, financial condition, and results of operations. Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.

151.   The 2013 10-K also stated that OPKO believed it was "substantially compliant with all existing statutes and regulations applicable to our business." While the 2013 10-K failed to disclose the pump-and-dump schemes described in the SEC Complaint, it acknowledged the material importance that such illegal activity and the attendant risk of legal action could have on OPKO's business, stating that "[l]egal actions could result in substantial monetary damages as well as damage to the Company's reputation with customers, which could have a material adverse effect upon our results of operations and financial position."

152.   In addition, the 2013 10-K discussed the Company's investment in BioZone but made no mention of Frost's role in its pump-and-dump scheme, stating, *inter alia*:

> In February 2012, we purchased from Biozone Pharmaceuticals, Inc., a publicly-traded company engaged in the manufacture and sale of pharmaceutical and cosmetic products ("BZNE"), $1.7 million of 10% secured convertible promissory notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal to $0.20 per common share, which BZNE Notes are due and payable on February 24, 2014 and ten year warrants (the "Warrants") to purchase 8.5 million shares of BZNE common stock at an exercise price of $0.40 per share. On January 3, 2014, BZNE finalized its planned merger with Cocrystal Discovery, Inc. ("Cocrystal"), a privately-held biopharmaceutical company in which we made an investment in September 2009 (refer below and to Note 12 for details regarding our investment in Cocrystal). In January 2014, we invested an additional $.5 million in the combined Biozone- Cocrystal entity pursuant to which we acquired 1 million shares of Biozone's common stock and 1 million warrants to acquire additional Biozone common stock. As of December 31, 2013, we owned an approximately 16% equity position in BZNE.

153.   The 2013 10-K was signed by defendants Frost, Hsiao, Rubin, Lerner, Paganelli, Pfenniger, and Yu and contained SOX certifications by defendants Frost and Rodriguez attesting

to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

154.   For the next three quarters, the OPKO Individual Defendants caused the Company to file quarterly reports on Form 10-Q (the "2014 10-Qs").   The 2014 10-Qs contained misstatements similar to those described in the 3Q 2013 10-Q, highlighting the importance of defendant Frost to OPKO's business, discussing OPKO's investment in BioZone, and attesting to the accuracy of OPKO's financial reporting and the disclosure of all fraud.

155.   On February 27, 2015, the OPKO Individual Defendants caused the Company to file a Form 10-K for 2014 with the SEC (the "2014 10-K"), which provided the Company's full year 2014 financial results.   The 2014 10-K contained misstatements similar to those described in 2013 10-K highlighting the importance of defendant Frost and his reputation to OPKO's business and stating that the Company was substantially compliant with all applicable laws and regulations.

156.   In addition, the 2014 10-K discussed the Company's investment in BioZone but made no mention of Frost's role in its pump-and-dump scheme described in the SEC Complaint, stating *inter alia:*

> In 2012, we made a $1.7 million investment in Biozone.  Effective January 2, 2014, Biozone completed a merger with Cocrystal, another entity in which we have an equity investment, to which Cocrystal was the surviving entity, and the name of the issuer was changed to Cocrystal Pharma, Inc. ("CPI").  Dr. Frost previously invested in both Biozone and Cocrystal.  Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share.  At December 31, 2014, we hold an 8% ownership interest in CPI.

157.   The 2014 10-K was signed by defendants Frost, Hsiao, Rubin, Lerner, Paganelli, Pfenniger, and Yu and contained signed SOX certifications by defendants Frost and Logal

attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

158. On April 8, 2015, defendant O'Rourke wrote an article for "Wall Street Advisors" on *Seeking Alpha*, titled "OPKO Spots Another Overlooked Opportunity in MabVax Therapeutics." Similar to the earlier *Seeking Alpha* article on Biozone, this article used OPKO and defendant Frost's reputations to improperly pump up the price of MabVax securities.

159. On May 11, 2015, the OPKO Individual Defendants caused the Company to file a Form 10-Q for the first quarter of 2015 (the "1Q 2015 10-Q"). The 1Q 2015 10-Q contained misstatements similar to those described in the 2014 10-Qs highlighting the importance of defendant Frost to OPKO's business and attesting to the accuracy of OPKO's financial reporting and the disclosure of all fraud. The 1Q 2015 10-Q also contained similar misrepresentations regarding the Company's investment in BioZone, but made no mention of Frost's role in its pump-and-dump scheme described in the SEC Complaint.

160. On July 1, 2015, Ford published another article, "MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5," on *Seeking Alpha*. As part of the pump-and-dump scheme to inflate the price of MabVax securities, the article emphasized defendants OPKO and Frost's investment in MabVax in order to induce investor interest. For example, among similar representations, the article stated that "Dr. Phillip Frost and OPKO just invested in MabVax and given Dr. Frost's track record, MabVax could be another home run trade." The article further stated:

> One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's, recent investment in the company. Dr. Frost and Opko were the lead investor's in an $11.7 million deal. Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology.

One of the most important questions for investors is whether or not MabVax's technology works. ***Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative. In other words, Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid.***

***I first became aware of Dr. Frost when I wrote about his flagship company Opko. At the time of my first Opko article, the shares were trading at $4, and have since risen above $19. Opko is a great company, and its involvement with MabVax will be positive for MabVax.***

***Another example of Dr. Frost's success includes his investment in Cocrystal Pharma at $.30 per share. Cocrystal has traded above $1.50 this year, providing more than a 5X return. I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performers.***

(Emphasis added).

161.    As with the earlier article written by Ford, he failed to disclose he was being compensated for writing the article as part of the pump-and-dump scheme described in the SEC Complaint.

162.    On August 5, 2015, the OPKO Individual Defendants caused the Company to file a Form 10-Q for the second quarter of 2015 (the "2Q 2015 10-Q"). The 2Q 2015 10-Q contained misstatements similar to those described in 1Q 2015 10-Q, highlighting the importance of defendant Frost to OPKO's business and attesting to the accuracy of OPKO's financial reporting and the disclosure of all fraud. The 2Q 2015 10-Q also contained similar misrepresentations regarding the Company's investment in BioZone as stated in the 2014 10-K. In addition, the 2Q 2015 10-Q discussed the Company's investment in MabVax, but made no mention of Frost and OPKO's role in the pump-and-dump-scheme, stating, *inter alia*:

In April 2015, we made a $2.5 million investment in a private placement transaction with MabVax Therapeutics Holdings, Inc. pursuant to which we acquired 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock. Prior to our investment in MabVax, Dr. Frost held shares in MabVax indirectly through an entity in which he has an ownership interest. Dr. Frost, as well as non-affiliated investors, invested in the private placement transaction on the same financial

terms.  In connection with the OPKO investment, Steven Rubin, our Executive Vice President, Administration, was appointed as an advisor to MabVax, and we have the right to designate two board members.

163.    On November 9, 2015, the OPKO Individual Defendants caused the Company to file a Form 10-Q for the third quarter of 2015 (the "3Q 2015 10-Q").  The 3Q 2015 10-Q contained misstatements similar to those in the 2Q 2015 10-Q, highlighting the importance of defendant Frost to OPKO's business, discussing OPKO's investment in BioZone and attesting to the accuracy of OPKO's financial reporting and the disclosure of fraud.  Additionally, the 3Q 2015 10-Q stated: "In October 2015, we made an additional $375 thousand investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock."

164.    On February 29, 2016, the OPKO Individual Defendants caused the Company to file its 2015 10-K, which provided the Company's full year 2015 financial results.  The 2015 10-K contained misstatements similar to those described in the 2014 10-K highlighting the importance of defendant Frost and his reputation to OPKO's business and stating that the Company was substantially compliant with all applicable laws and regulations.  In addition, the 2015 10-K contained similar misrepresentations regarding the Company's investments in BioZone and MabVax as stated in the 3Q 2015 10-Q, but made no mention of Frost and OPKO's role in the pump-and-dump schemes described in the SEC Complaint.

165.    The 2015 10-K was signed by defendants Frost, Hsiao, Rubin, Lerner, Paganelli, Pfenniger, and Yu.  The 2015 10-K contained signed SOX certifications by defendant Frost and Logal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

166.    For the next three quarters, the OPKO Individual Defendants caused the Company quarterly reports on Form 10-Q (the "2016 10-Qs").  The 2016 10-Qs contained misstatements

similar to those described in the 3Q 2015 10-Q, highlighting the importance of defendant Frost to OPKO's business and attesting to the accuracy of OPKO's financial reporting and the disclosure of all fraud.  In addition, the 2016 10-Qs discussed the Company's investments in BioZone and MabVax, but made no mention of Frost and OPKO's role in the pump-and-dump scheme, stating, *inter alia*, "We hold investments in . . . MabVax (1%) [and] COCP (8%). . . .  In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock."  The third quarter 2016 Form 10-Q provided additional discussion of OPKO's investments, stating, *inter alia*:

> We hold investments in . . . MabVax (4%) [and] COCP (8%). . . .  In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock. . . .  In August 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock.  In September 2016 we invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

167.  On March 1, 2017, the OPKO Individual Defendants caused the Company to file a Form 10-K for 2016 with the SEC (the "2016 10-K"), which provided the Company's full-year 2016 financial results.  The 2016 10-K contained misstatements similar to those described in the 2015 10-K, highlighting the importance of defendant Frost and his reputation to OPKO's business.  In addition, the 2016 10-K contained similar misrepresentations regarding the Company's investments in BioZone and MabVax as stated in the third quarter 2016 Form 10-Q, but made no mention of Frost and OPKO's involvement in the pump-and-dump schemes described in the SEC Complaint.

168.  The 2016 10-K was signed by defendants Frost, Hsiao, Rubin, Lerner, Paganelli, Pfenniger, and Yu.  The 2016 10-K contained signed SOX certifications by defendants Frost and

Logal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

169.    On May 10, 2017, the OPKO Individual Defendants caused the Company to file a Form 10-Q for the first quarter of 2017; on August 8, 2017, the second quarter of 2017 (the "2Q 2017 10-Q"); and on November 8, 2017, the third quarter of 2017 (the "3Q 2017 10-Q," and collectively the "2017 10-Qs").   The 2017 10-Qs contained misstatements similar to those described in the 2016 10-Qs, highlighting the importance of defendant Frost to OPKO's business and attesting to the accuracy of OPKO's financial reporting and the disclosure of all fraud.   In addition, the 2017 10-Qs contained similar misrepresentations regarding the Company's investments in BioZone and MabVax as stated in the 3Q 2016 10-Q, but made no mention of Frost and OPKO's role in the pump-and-dump schemes.   Additional statements regarding the Company's investments in BioZone and MabVax were made in the 2Q 2017 10-Q and 3Q 2017 10-Q, including, *inter alia*:

> We hold investments in . . . MabVax (4%) [and] COCP (9%). . . .
>
> *            *            *
>
> In July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of common stock, and in May 2017 we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock.   We had also invested an additional $1.0 million in MabVax in August 2016 for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock.
>
> In April 2017, we invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock, and in August 2016, we had invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

170.    On March 1, 2018, the OPKO Individual Defendants caused the Company to file its 2017 10-K with the SEC, which provided the Company's full-year 2017 financial results.   The 2017 10-K contained misstatements similar to those described in the 2016 10-K,

highlighting the importance of defendant Frost and his reputation to OPKO's business.  In addition, the 2017 10-K contained similar misrepresentations regarding the Company's investments in BioZone and MabVax as stated in the 3Q 2017 10-Q, but made no mention of Frost and OPKO's role in the pump-and-dump schemes.

171.    The 2017 10-K was signed by defendants Frost, Hsiao, Rubin, Lerner, Paganelli, Pfenniger, and Yu.  The 2017 10-K contained signed SOX certifications by defendants Frost and Logal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

172.    On May 8, 2018, the OPKO Individual Defendants caused the Company to file a Form 10-Q for the first quarter of 2018 (the "1Q 2018 10-Q"), and on August 7, 2018, the second quarter of 2018 (the "2Q 2018 10-Q").  The 1Q 2018 10-Q and 2Q 2018 10-Q contained misstatements similar to those in the 2017 10-Qs, highlighting the importance of defendant Frost to OPKO's business and attesting to the accuracy of OPKOs financial reporting and the disclosure of all fraud.  The 1Q 2018 10-Q and 2Q 2018 10-Q also discussed the Company's investment in BioZone and MabVax, but made no mention of Frost and OPKO's role in the pump-and-dump schemes, stating, *inter alia*:

> We hold investments in . . . MabVax (2%) [and] COCP (9%). . . .  In February 2018, we invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock.  In April 2017, we invested an additional $1.0 million in COCP for 138,889 shares of its common stock, and in August 2016, we had invested an additional $2.0 million in COCP for 162,602 shares of its common stock.

> *             *             *

> In July 2017, we invested an additional $0.1 million in MabVax for 50,714 shares of common stock and in May 2017, we invested an additional $0.5 million in MabVax for 1,667 shares of Series L Preferred Stock and 107,607 shares of Series I Preferred Stock.

173.    The above statements were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.  Specifically, the OPKO Individual Defendants willfully and/or recklessly caused the Company to make false and misleading statements that failed to disclose that:   (1) defendant Frost had participated and orchestrated a series of illegal pump-and-dump schemes; (2) the investments by defendants Frost and OPKO in the target companies were done in furtherance of the pump-and-dump schemes in order to enrich defendant Frost, the Frost Entities, and the Frost Pump-and-Dump Posse, and were not made in order to benefit OPKO or the Company's stockholders; (3) OPKO's investments in BioZone and MabVax were worth considerably less than represented because of Frost and OPKO's involvement in the-pump and dump scheme and, in the case of BioZone, because the target company had not been provided promised financing resulting in the cessation of research and development activities in mid-2012; (4) defendant Frost had taken efforts to conceal his control over target companies in the pump-and-dump schemes, including by falsely stating that he was acting as a passive investor in SEC filings and by concealing his concerted efforts to facilitate illegal stock manipulation with other members of the Frost Pump-and-Dump Posse; (5) defendant Frost had facilitated the publication of false and misleading promotional materials in order to artificially inflate the stock of target companies in the pump-and-dump schemes; (6) as a result of above, OPKO was subjected to significant and undisclosed legal, regulatory, reputational, and financial risks should defendant Frost's and its involvement in the pump-and-dump schemes come to light; and (7) as a result of the foregoing, the Company's statements about OPKO's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**E.      The OPKO Individual Defendants Cause OPKO to Issue a Materially False and Misleading Proxy Statement**

174.      In addition to the above false and misleading statements issued and/or caused to be issued by the OPKO Individual Defendants, they also caused the Company to issue a false and misleading proxy statement, which sought stockholder votes for, *inter alia*, director re-election and an advisory vote on executive compensation.

175.      On April 30, 2018, the OPKO Individual Defendants caused the Company to file the 2018 Proxy with the SEC.  The 2018 Proxy was disseminated to stockholders in connection with the Company's annual stockholder meeting.  The OPKO Individual Defendants drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to OPKO's stockholders.  The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2018 Proxy was likewise materially false and misleading.

176.      Among other things, the 2018 Proxy provided information about and solicited stockholder votes for the director nominees up for election, defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu.  In addition, the 2018 Proxy described director responsibilities; the duties of each Board committee; Board risk assessment and management; and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.  The 2018 Proxy also sought stockholder advisory approval of executive compensation.

177.      The 2018 Proxy was false and misleading because the Individual Defendants were aware, but failed to disclose that:  (1) defendant Frost had participated and orchestrated a series of illegal pump-and-dump schemes; (2) the investments by defendants Frost and OPKO in the target companies were done in furtherance of the pump-and-dump schemes in order to enrich defendant Frost, the Frost Entities, and the Frost Pump-and-Dump Posse, and were not made in

order to benefit OPKO or the Company's stockholders; (3) OPKO's investments in BioZone and MabVax were worth considerably less than represented because of Frost and OPKO's involvement in the-pump and-dump scheme and, in the case of BioZone, because the target company had not been provided promised financing resulting in the cessation of research and development activities in mid-2012; (4) defendant Frost had taken efforts to conceal his control over target companies in the pump-and-dump schemes, including by falsely stating that he was acting as a passive investor in SEC filings and by concealing his concerted efforts to facilitate illegal stock manipulation with other members of the Frost Pump-and-Dump Posse; (5) defendant Frost had facilitated the publication of false and misleading promotional materials in order to artificially inflate the stock of target companies in the pump-and-dump schemes; (6) as a result of above, OPKO was subjected to significant and undisclosed legal, regulatory, reputational, and financial risks should defendant Frost's and its involvement in the pump-and-dump schemes come to light; and (7) as a result of the foregoing, the Company's statements about OPKO's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## F.    Defendants Logal, Lerner, Rubin, and Paganelli Unlawfully Profited at OPKO's Expense by Selling Shares at Artificially-Inflated Prices

178.    While in possession of knowledge that OPKO and the Frost Pump-and-Dump Posse were embroiled in multiple pump-and-dump schemes, Logal, Lerner, Rubin, and Paganelli sold large quantities of their personal holdings of OPKO shares at inflated prices totaling almost $3 million prior to the pump-and-dump schemes being made public.

179.    Defendant Logal is OPKO's Senior Vice President and CFO.  He is also named as a defendant in the Securities Class Actions.  Logal was aware of material, adverse, and non-public information regarding OPKO's involvement in the Frost Pump-and-Dump Posse's various

pump-and-dump schemes and the Company's statements related thereto.  While in possession of this information, Logal sold 212,649 shares of OPKO stock between March 12, 2017 and June 6, 2018, at artificially-inflated prices, for total proceeds of $1,467,083.97.

180.    Defendant Lerner is a member of OPKO's Board.  Lerner was aware of material, adverse, and non-public information regarding OPKO's involvement in the Frost Pump-and-Dump Posse's various pump-and-dump schemes and the Company's statements related thereto. While in possession of this information, Lerner sold 37,468 shares of OPKO stock between March 12, 2017 and May 13, 2018, at artificially-inflated prices, for total proceeds of $195,352.82.

181.    Defendant Rubin is Executive Vice President – Administration and a member of OPKO's Board.  Rubin was aware of material, adverse, and non-public information regarding OPKO's involvement in the Frost Pump-and-Dump Posse's various pump-and-dump schemes and the Company's statements related thereto.  While in possession of this information, Rubin sold 158,336 shares of OPKO stock on April 11, 2017, at artificially-inflated prices, for total proceeds of $1,212,853.76.

182.    Defendant Paganelli is a member of OPKO's Board.  Paganelli was aware of material, adverse, and non-public information regarding OPKO's involvement in the Frost Pump-and-Dump Posse's various pump-and-dump schemes and the Company's statements related thereto.  While in possession of this information, Paganelli sold 13,868 shares of OPKO stock between February 21, 2017 and March 5, 2017, at artificially-inflated prices, for total proceeds of $109, 612.

183.    These insider sales total almost $3 million in proceeds and were all executed while OPKO's stock price was artificially inflated due to the unlawful conduct alleged herein.

**G.     The Truth is Revealed**

184.    On September 7, 2018, the SEC issued a press release announcing the filing of a complaint against, among others, Frost, Honig, O'Rourke, Brauser, OPKO, Southern Biotech, and FGIT.  The release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," stated, in relevant part:

> The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes.  ***Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes.***  Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume.  According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.
>
> "As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement.  "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."
>
> ***The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig***, John Stetson, ***Michael Brauser, John R. O'Rourke III,*** Mark Groussman, ***Frost,*** Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., ***OPKO Health Inc., Frost Gamma Investments Trust,*** Southern Biotech Inc., and Stetson Capital Investments Inc. ***with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief***.

(Emphasis added.)

185.     The SEC Action alleges that  OPKO aided and abetted violations of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act") by providing knowing and substantial assistance to Frost, Honig, Brauser, and O'Rourke in their course of business that operated as a fraud or deceit upon others.  The SEC Action also alleges that OPKO violated Section 13(d) and Rule 13d-1(a) of the Exchange Act by failing to identify itself as part of a group with other named defendants, who were each under an obligation to file true and accurate reports with respect to their ownership of the microcap securities traded in the pump-and-dump schemes and failed to so.

186.     On this news, the price of OPKO stock dropped $1.01 per share, or 18%, from the previous day's closing price, trading at $4.58 per share at 2:34 PM EDT on September 7, 2018, at which time NASDAQ halted trading of OPKO shares.  This represented a decrease of over $565 million in market capitalization.

187.     Following the announcement of the SEC Action, Frost stepped down as chairman from his brokerage firm, Ladenburg Thalmann Financial Services.  OPKO issued a press release on September 7, 2018 responding to the SEC's allegations, as follows:

> MIAMI, Sept. 07, 2018 -- OPKO Health, Inc. (NASDAQ: OPK) provided the following comment on the lawsuit filed by the U.S. Securities and Exchange Commission earlier today.
>
> "OPKO learned today that the Securities and Exchange Commission has filed a lawsuit in the Southern District of New York against a number of individuals and entities, including OPKO and its CEO and Chairman Phillip Frost.  The SEC failed to provide notice of its intent to sue prior to filing the complaint, which contains serious factual inaccuracies.  Had the SEC followed its own standard procedures, OPKO and Dr. Frost would gladly have provided information that would have answered a number of the SEC's apparent questions, and filing of this lawsuit against them could have been avoided.  OPKO and Dr. Frost have always prided themselves on adhering to the highest standards of financial disclosure, and they are confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for them."

The Company noted that the complaint does not contain any allegations about OPKO's financial practices, financial statements or business practices.

188.    Even though the Company refuted the claims, it was unable to identify any of the purported "factual inaccuracies" in the SEC Complaint.

189.    On September 11, 2018, the Company issued a press release updating investors on NASDAQ's suspension of trading for OPKO stock, as follows:

> MIAMI, Sept. 11, 2018 -- OPKO Health, Inc. (NASDAQ: OPK) has had trading in its common stock halted by The Nasdaq Stock Market, and the exchange has advised OPKO that the halt will continue until the company responds (to Nasdaq's satisfaction) to the exchange's request/or information related to the previously reported lawsuit filed by the U.S. Securities and Exchange Commission against a number of individuals and entities, including OPKO and its CEO and Chairman Phillip Frost.  As noted previously, the lawsuit does not contain any allegations about OPKO's financial practices, financial statements or business practices, and OPKO is confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for the company.  OPKO is working expeditiously to respond to Nasdaq's request for information, but it cannot currently estimate when trading will resume.

190.    On September 14, 2018, defendant Frost released a statement in response to the SEC Action, which stated, in relevant part:

> "I was stunned by the SEC's lawsuit and deny the allegations it contains against me.  It was particularly disturbing that the SEC departed from its own longstanding practice of providing advance notice and a meaningful opportunity to address their questions in advance of filing an action."

> "The allegations against me are belied by common sense, my history of supporting promising scientific technology, and the facts.  I invested in two of the entities identified in the complaint.  These investments were made because I understood the entities presented promising medical developments and a real opportunity to deliver value for shareholders.  I remain a significant long-term shareholder in both companies."

> "Nothing is more important to me than my integrity and I am deeply proud of the role I have played over many decades in developing medicines and diagnostic tools that have improved many lives.  I intend to fight the charges that have been brought against me and will fight to clear my name."

191.     OPKO stock resumed trading on September 14, 2018.  Upon the resumption of trading, the price of OPKO shares fell an additional $0.68, or approximately 15%, closing at $3.90 on September 14, 2018, representing an additional loss of over $380 million in market capitalization.

192.     Ford, who authored several *Seeking Alpha* articles on behalf of the Frost Pump-and-Dump Posse and was a defendant in the SEC Action, quickly settled the SEC's charges that he took undisclosed payments to tout stocks on *Seeking Alpha* and his personal blog.  On September 21, 2018, the Court in the SEC Action entered a judgment against Ford in which he agreed to settle, without admitting or denying the allegations against him, in exchange for prohibitions on violating the federal securities laws in the future, a permanent bar from participating in any offering of penny stock, a civil penalty, and disgorgement of all gains and prejudgment interest thereon.  The amount of disgorgement and the civil penalty are to be determined by the Court.

193.     On December 27, 2019, Frost, OPKO, and FGIT settled the claims against them in the SEC Action.  Defendant Frost agreed to pay a $5 million fine and $433,181.06 in disgorgement, plus $90,206.46.  He is also permanently banned from trading penny stocks, with limited carveouts.  OPKO agreed to pay a $100,000, not violate the federal securities laws in the future, and establish a "Management Investment Committee."  FGIT is permanently banned from trading penny stocks, with limited carveouts, and is permanently banned from trading the stock of OPKO, Ladenburg Thalmann Financial Services, Inc., Teva, Castle Brands, Inc., or Vector Group, Ltd.  Although Frost and OPKO did not admit any guilt in the settlement, they did call the charges potentially "expensive" and "contentious."

## DAMAGES TO OPKO

194.    As a result of the wrongful conduct described herein, OPKO was a part of several illegal pump-and-dump schemes involving the manipulation of the stock prices of several other companies.   The Company also disseminated false and misleading statements and omitted material information that would have rendered the statements neither false nor misleading.   The involvement in the illegal schemes and improper statements have devastated the Company's credibility.   OPKO has been, and will continue to be, severely damaged by the named defendants' misconduct.

195.    As described above, prior to its involvement in the pump-and-dump schemes, OPKO was thought to be a crown jewel of the pharmaceutical industry.   It was this formerly sterling reputation that allowed defendant Frost and the Frost Pump-and-Dump Posse to use OPKO's involvement to give each pump-and-dump scheme the air of legitimacy.   Now that OPKO and defendant Frost, OPKO's founder and controlling stockholder, have been implicated in several illegal schemes, that reputation will be devastated.

196.    Indeed, the Individual Defendants' false and misleading statements as alleged herein have subjected OPKO to the SEC Action and the Securities Class Actions.   The allegations in the SEC Action and Securities Class Actions are incorporated by reference as if fully set forth herein.

197.    Due to the misconduct and false and misleading statements, OPKO has incurred expenses and fines associated with the SEC Action and its settlement and will continue to incur expenditures associated with, among other things, defending the Securities Class Actions and excessive compensation paid to several of the OPKO Individual Defendants.

198.    As a direct and proximate result of the Individual Defendants' actions as alleged herein, OPKO's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value.

199.    Additionally, as a result of the materially misleading 2018 Proxy, defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu were all elected to new one-year terms as directors.   These Individual Defendants, who caused the damages to the Company described herein, were given renewed power as a result of their false and misleading statements.

200.    The Company has also been forced to pay costs associated with responding to, defending, and paying millions of dollars of fines in the SEC Action.

201.    Each of the pump-and-dump schemes has also resulted in related litigation.   Each company that was the vehicle for a pump-and-dump scheme conducted by the Frost Pump-and-Dump Posse has been subjected to the securities fraud class actions and derivative suits.   OPKO will likely be forced to expend funds related to those suits including, *inter alia*, to:   damages, attorneys' fees, and costs associated with producing witnesses even when not specifically named a party.

202.    In addition to the civil actions pending against OPKO and several defendants, OPKO and defendant Frost may be subjected to criminal prosecution for their participation in the pump-and-dump schemes described herein.   According to a September 11, 2018 *Seeking Alpha* article by Hindenburg Investment Research, titled "Opko Health: If These SEC Charges Were Surprising Then You Haven't Been Paying Attention," it is highly likely that there is an FBI investigation running parallel to the SEC Action, which may result in criminal indictments.

203.    Moreover, the actions described herein have irreparably damaged OPKO's corporate image and goodwill.  For at least the foreseeable future, OPKO will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that OPKO's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

204.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

206.    Plaintiff currently owns OPKO common stock and continuously owned OPKO common stock during the Relevant Period.

207.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

208.    As a result of the facts set forth herein, Plaintiff has not made any demand on the OPKO Board to institute this action against the named defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

209.    At the time this action was commenced, the Board consisted of nine directors: defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu (the "Director Defendants").  All nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## A.   Demand is Futile Because Defendant Frost Dominates and Controls the Board

210.   Demand is excused because the Board is dominated and controlled by defendant Frost.  Defendants Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger, Fishel, and Yu were all personally appointed as directors by Frost, OPKO's controlling stockholder, and thus they serve on the Board at Frost's pleasure because he is able to appoint and remove any director of his choosing.  Moreover, Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger, Fishel, and Yu will not commence and vigorously prosecute this action against Frost because the Company's success is dependent on Frost, as conceded by the OPKO Individual Defendants in the Company's SEC filings. Thus, the Company's reliance on Frost's involvement in the Company is essential to the success of OPKO and that reliance prevents Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger, Fishel, and Yu from disinterestedly and independently considering a demand against Frost.

## B.   Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu Each Face a Substantial Likelihood of Liability

211.   The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

212.   Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.   Instead, they knowingly and consciously reviewed,

authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially-inflated prices.

213.    The Director Defendants knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  The Director Defendants also signed the materially false and misleading 2017 10-K and 2018 Proxy. These actions constitute breaches of the fiduciary duties of loyalty and good faith for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of OPKO to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

**C.     Defendant Frost Lacks Independence and Is Not Disinterested**

214.    As an initial matter, Frost controls almost 72% of OPKO's common stock and is the Company's controlling stockholder.  He alone has the power to elect or remove any member of the Board or to approve or strike down any stockholder proposal.  He is also the Company's founder and has served as its only CEO.  Further, he subjected the Company to liability as he was personally named as a defendant in the SEC Action for his participation in the pump-and-dump schemes.  He also has extensive connections to the other members of the Frost Pump-and-Dump Posse, who carried out the pump-and-dump schemes described herein and being prosecuted in the SEC Action.   As such, Frost is incapable of considering a demand to commence and vigorously prosecute this action.

**D.      Defendant Hsiao Lacks Independence**

215.    As an initial matter, OPKO has conceded in its SEC filings that Hsiao is not an independent director of the Company.  The 2018 Proxy states that Hsiao is not independent under the applicable SEC rules and regulations and the Nasdaq Stock Market listing requirements and rules.

216.    Demand is also futile against defendant Hsiao given her employment with OPKO and other Frost-controlled entities.  She has been OPKO's Vice-Chairman and Chief Technical Officer since 2007 and because of her executive officer role, the Company admits in the 2018 Proxy that she is not an independent director.  For her roles at the Company, Hsiao receives substantial compensation, including approximately $2.9 million in 2016 and $915,800 in 2017.  These amounts are material to her.  Her annual salary, bonuses, and other compensation were approved by the Company's current Compensation Committee, comprised of defendants Lerner and Krasno and therefore, Hsiao lacks independence from these directors.

217.    Furthermore, defendant Hsiao has a longstanding personal and professional affiliation with Frost such that she cannot independently consider a demand against him.  According to the *Forbes* article, titled "Meet Miami's Renaissance Billionaire," "[j]ust outside Frost's office is a glass-enclosed 'atrium,' where he lunches daily with senior executives, including Dr. Jane Hsiao, a brilliant chemist with an M.B.A., whose late husband, Charles, co-founded Ivax with Frost.  Hsiao is a vice chairman of OPKO."

218.    Hsiao and Frost also have a close relationship in the philanthropic realm.  Frost and his wife, Patricia, are the main benefactors of the Phillip and Patricia Frost Museum of Science.  In an article in the *Miami New Times*, titled "New Frost Science Exhibition Shows How the Brain Rewires Itself After Injury," Daniella Orihuela, an exhibition developer at the Phillip and Patricia Frost Museum of Science, discusses a "new exhibition, which will be divided

into seven sections within the museum's Hsiao Family Special Exhibition Gallery."  Similarly, Frost and his wife also are main benefactors of the Patricia & Phillip Frost Art Museum.  In a press release discussing the recent exhibition opening for Many Visions, Many Versions: Art from Indigenous Communities in India, the Frost Art Museum makes clear that "[t]his exhibition was made possible at the Frost Art Museum through the generous support of the Jane Hsiao Asian Art Endowment."  The Hsiao Endowment has made many exhibits at Frost Art Museum possible, illustrating that defendants Frost and Hsiao have such a close business and personal relationship that neither could independently consider a demand against the other.

219.    Hsiao has also served in numerous capacities in Frost-affiliated and controlled companies.  For instance:

   a.      She is a director of CoCrystal;

   b.      She was a director and Vice-Chairman – Technical Affairs of Ivax from 1995 to 2006, during the period when Frost was Chairman and CEO;

   c.      She was Chairman, CEO, and President of IVAX Animal Health from 1998 to 2006, during the period when Frost was Chairman and CEO of parent Ivax;

   d.      She was a director of TransEnterix since Frost took control on September 3, 2013; and

   e.      She was a director of Prolor Biotech, Inc. from 2008 until it was acquired by OPKO in 2013.

220.    Based on these past and current positions, Hsiao holds large stakes in several Frost entities, including over 306,000 shares in CoCrystal, 4,990,230 shares of TransEnterix,

received over $600,000 when Ivax was purchased by Teva, and received over $700,000 when Prolor was acquired by OPKO.  For the foregoing reasons, demand on Hsiao is futile.

**E.      Defendant Rubin Lacks Independence and is Not Disinterested**

221.      Demand is also futile as to defendant Rubin given his employment with OPKO and other Frost-controlled entities.  In addition to being a director, Rubin has been Executive Vice President – Administration since 2007.  OPKO admits in its 2018 Proxy that Rubin is not an independent director because of his executive officer role.  For his roles at the Company he receives significant compensation, including over $2.7 million in 2016 and $820,800 in 2017.  These amounts are material to him.  Defendant Rubin's annual salary, bonuses, and other compensation were approved by the Company's current Compensation Committee, comprised of defendants Lerner and Krasno and therefore, Rubin lacks independence from these directors.

222.      Furthermore, defendant Rubin has longstanding personal and professional affiliations with defendant Frost such that he cannot independently consider a demand against him.  According to the *Forbes* article, titled "Meet Miami's Renaissance Billionaire," "[a]nother regular lunch mate [of Frost] is Steven Rubin, a former mergers-and-acquisitions lawyer who joined Frost in 1986 after Frost sold Key and started Ivax.  Rubin is Frost's deals guy, sitting on the boards of many of his companies."  Defendant Rubin also worked for Frost's private company, the Frost Group, which describes itself as "a private equity firm specializing in PIPE investments."

223.      Rubin has also served in numerous capacities in Frost-affiliated and controlled companies.  For instance:

a.      He is a director of Castle Brands, Inc. ("Castle Brands"), in which Frost beneficially owns over 30%;

b.      He is an advisor to MabVax;

75

c.     He was the Interim CEO and CFO and a director of Tiger X Medical, Inc., in which Frost beneficially owns more than 10%;

d.     He is a director of CoCrystal;

e.     He was a Senior Vice President, General Counsel, and Secretary of Ivax from 2001 to 2006, during the period when Frost was Chairman and CEO;

f.     He was a director of Prolor Biotech, Inc. from 2008 until it was acquired by OPKO in 2013;

g.     He is a director of Sevion Therapeutics, Inc., now known as Eloxx Pharmaceuticals, in which both Frost and OPKO have large investments; and

h.     He is a director of ChromaDex, Inc., in which OPKO holds a substantial position.

224.     Based on these past and current positions, Rubin holds large stakes in several Frost entities, including over 241,000 shares of Castle Brands and also earned almost $200,000 as a Castle Brands director, 564,952 shares of CoCrystal, held 124,753 shares of Prolor before it was acquired by OPKO and received over $65,000 as a director, 59,120 shares of Eloxx and received over $236,000 as a director, 45,311 shares of VBI and received $87,375 as a director, and received over $137.5 thousand as a director of ChromaDex, Inc.

225.     For the foregoing reasons, demand on Rubin is futile.

**F.     Defendants Krasno, Rubin, Pfenniger, Lerner, and Hsiao Cannot Independently Consider a Demand Against Frost and Each Other Given Their Close, Interwoven Web of Business Relationships**

226.     In the 2018 Proxy, OPKO disclosed a vast array of interwoven business relationships and transactions involving defendants Krasno, Rubin, Pfenniger, Lerner, and Hsiao have with each other, Frost, and companies affiliated with Frost.   These close business

relationships and transactions prevent each of them from independently evaluating a demand against Frost and one another:

- "Frost's service as Chairman of the Board of Ladenburg Thalmann Financial Services Inc., an entity in which Dr. Frost beneficially owns more than ten percent (10%) and for which Dr. Krasno serves as a member of the Board of Directors;"

- "Drs. Frost's and Krasno's and Mr. Rubin's service as members of the Board of Directors of Castle Brands, Inc., an entity in which Dr. Frost beneficially owns more than ten percent (10%);"

- "Mr. Pfenniger's and Dr. Krasno's service as members of the Board of Directors of Biocardia, Inc., formerly Tiger X Medical, Inc., an entity in which Dr. Frost beneficially owns more than ten percent;"

- "Mr. Rubin's previous service as Interim Chief Executive Officer and Interim Chief Financial Officer and as a member of the Board of Directors of Tiger X Medical, Inc. until its merger with Biocardia, Inc. in October 2016;"

- "[T]he Company's investments in Zebra Biologics, Inc. ("Zebra"), an entity for which Dr. Lerner is the founder and currently serves as a director and scientific advisor and Dr. Frost currently serves as a director;"

- "Dr. Frost's and Mr. Pfenniger's service on the Board of Trustees and Mr. Pfenniger's service as Vice Chairman of the Executive Committee of the Board of the Frost Museum of Science, an entity in which the Company has pledged to contribute an aggregate of $1 million."

- Pfenniger has a significant business relationship with Frost going back approximately 30 years and has been described as a "longtime Frost executive."

- "[FGIT] a trust controlled by Dr. Phillip Frost, our Chairman of the Board and Chief Executive Officer, Dr. Jane H. Hsiao, our Vice Chairman and Chief Technical Officer, and Steven D. Rubin, our Executive Vice President – Administration and a member of our Board, are each members of The Frost Group, LLC (the "Frost Group"), an entity which beneficially owns approximately 3.59% of our common stock as of April 18, 2018. Furthermore, the Gamma Trust beneficially owns approximately 33.54% of our common stock as of April 18, 2018. Dr. Hsiao beneficially owns approximately 5.94% of our common stock as of April 18, 2018, and Mr. Rubin beneficially owns less than 5% of our common stock as of April 18, 2018."

- "As of December 31, 2018, [OPKO] hold[s] investments in Cocrystal Pharma, Inc. ("COCP")(9%), Zebra Biologics, Inc. ("Zebra")(29%), Neovasc, Inc. (5%), ChromaDex Corporation (1%), MabVax Therapeutics Holdings, Inc.

("MabVax")(2%), Non-Invasive Monitoring Systems, Inc. (1%), and Biocardia, Inc. ("Biocardia")(5%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities;"

- Defendants Frost, Hsiao, and Rubin serve as directors on Cocrystal;

- Defendant Lerner is the founder, director, and scientific advisor of Zebra Biologics Inc., defendant Frost serves as a director, and OPKO participated in the financing;

- Defendants Hsiao and Rubin serve as directors of Neovasc, Inc.;

- Defendant Rubin serves as a director of ChromaDex Corporation, a company in which OPKO holds a substantial position;

- Defendant Hsiao has served as Chairman of the Board of Non-Invasive Monitoring Systems, Inc. since October 2008 and was named Interim Chief Executive Officer of Non-Invasive Monitoring Systems, Inc. in February 2012, and Rubin serves as a director of Non-Invasive Monitoring Systems, Inc.;

- "In April 2017, [OPKO] invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock. In February 2018, [OPKO] invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock. Drs. Frost and Hsiao and Mr. Rubin serve on the Board of Directors of COCP."

- "On February 27, 2018, [OPKO] agreed to issue a series of 5% Convertible Promissory Notes (the "Notes") in the aggregate principal amount of $55.0 million. The Notes mature five (5) years from the date of issuance. Each holder of a Note has the option, from time to time, to convert all or any portion of the outstanding principal balance of such Note, together with accrued and unpaid interest thereon, into shares of our common stock, par value $0.01 per share ("Common Stock"), at a conversion price of $5.00 per share of Common Stock (the "Shares"). [OPKO] may redeem all or any part of the then issued and outstanding Notes, together with accrued and unpaid interest thereon, pro ratably among the holders, upon no fewer than 30 days, and no more than 60 days, notice to the holders. Purchasers of the Notes include an affiliate of Dr. Frost ($25.0 million) and Dr. Hsiao ($5.0 million)."

- "In December 2017, Sevion Therapeutics, Inc. ("Sevion") completed the acquisition of Eloxx Pharmaceuticals, Inc. ("Eloxx"), and the surviving company is known as Eloxx Pharmaceuticals, Inc. Following the acquisition, Eloxx Pharmaceuticals, Inc. is no longer a related party of OPKO. In June 2017, we invested $1.5 million in Eloxx for 99,915 Preferred C Shares and in July 2017, we invested an additional $1.5 million in Sevion for 10,000,000 shares of Sevion

common stock.  An entity controlled by Dr. Frost also made an investment in Eloxx and Sevion.  In November 2016, we made a $0.2 million loan to Sevion, and in February 2017, we entered into an agreement with Sevion pursuant to which we delivered $0.3 million cash to Sevion in exchange for a promissory note.  The loan and promissory note were converted into 4.1 million shares of Sevion common stock in August 2017.  In September 2017, we converted 66,667 shares of Series C Preferred Stock of Sevion into 1,250,006 shares of common stock.  The agreements with Sevion were considered related party transactions as a result of our executive management's ownership interests and board representation in Sevion.  Dr. Frost and Mr. Rubin served on the Board of Directors of Sevion until its merger with Eloxx.  Mr. Rubin continues to serve as a director of Eloxx."

- "In November 2017, we invested $3.0 million in Neovasc for 2,054,794 shares of its common stock, 2,054,794 Series A warrants, 2,054,794 Series B warrants, and 822,192 Series C warrants."  Defendant Hsiao and Rubin serve as directors of Neovasc;

- "In May 2017, [OPKO] invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. In July 2017, [OPKO] invested an additional $0.1 million in MabVax for 152,143 shares of its common stock."

- "In November 2016, [OPKO] entered into a Pledge Agreement with the Museum of Science, Inc. and the Museum of Science Endowment Fund, Inc. pursuant to which [OPKO] will contribute an aggregate of $1.0 million over a four-year period for constructing, equipping and the general operation of the Frost Science Museum.  Dr. Frost and Mr. Pfenniger serve on the Board of Trustees of the Frost Science Museum and Mr. Pfenniger is the Vice Chairman of the Board of Trustees."; and

- [OPKO's] wholly-owned subsidiary, Bio-Reference, purchases and uses certain products acquired from InCellDx, Inc., a company in which we hold a 29% minority interest and which Mr. Rubin serves on the Board of Directors.

227.    Each of these connections further evidences why a demand on these directors would be futile.

## G.    Defendants Pfenniger, Paganelli, and Krasno Face a Substantial Likelihood of Liability as Members of the Audit Committee

228.    Defendants Pfenniger, Paganelli, and Krasno, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false

financial statements and repeated false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, Pfenniger, Paganelli, and Krasno were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Pfenniger, Paganelli, and Krasno failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as required by the Code.  Defendants Pfenniger, Paganelli, and Krasno, as members of the Audit Committee, also had duties to monitor OPKO's investment practices and failed in those duties by allowing the Company to participate in the pump-and-dump schemes.

229.    According to the 2018 Proxy, the Audit Committee is responsible for reviewing and approving any related-party transactions, as follows:

**Our Policies Regarding Related Party Transactions**

We have adopted a written statement of policy with respect to related party transactions, which is administered by our Audit Committee.  Under our related party transaction policy, a "Related Party Transaction" is any transaction, arrangement, or relationship (or any series of similar transactions, arrangements, or relationships) in which the Company or any of our subsidiaries was, is or will be a participant and the amount exceeds $100,000 and in which any Related Person had, has or will have a direct or indirect material interest.  A "Related Person" is any of our executive officers, directors or director nominees, any stockholder beneficially owning in excess of 5% of our stock or securities exchangeable for our stock, any immediate family member of any of the foregoing persons, and any firm, corporation, or other entity in which any of the foregoing persons is employed, is a partner or principal or in a similar position, or in which such person has a 5% or greater beneficial ownership interest in such entity.

It is the Company's policy to enter into or ratify Related Party Transactions only when the Audit Committee determines that the Related Party Transaction in question is in, or is not inconsistent with, the best interests of the Company.  In making this determination, the Audit Committee may take into account, among other factors it deems appropriate, whether the Related Party Transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the Related Person's interest in the transaction.  Pursuant to the Company's

policy, the Audit Committee has granted standing pre-approval to certain types of Related Party Transactions that are considered to be in, or consistent with, the best interests of the Company.

Pursuant to our related party transaction policy, a Related Party Transaction may only be consummated if:

•our Audit Committee approves or ratifies such transaction in accordance with the terms of the Company's policy;

•such transaction falls within the category of transactions that have previously been granted standing pre-approval; or

•the chair of our Audit Committee pre-approves or ratifies such transaction and the amount involved in the transaction is less than $250,000, provided that for the Related Party Transaction to continue it must be presented to our Audit Committee at its next regularly schedule meeting for review.

230.    The entire Board, but specifically the Audit Committee, ignored obvious red flags related to defendant Frost's relationships with Honig and the rest of the Frost Pump-and-Dump Posse. Back on November 29, 2014, Bill Alpert ("Alpert") published an article in *Barron's*, titled "Stockpicker's Blues," which would have put an Audit Committee (and Board) performing its oversight responsibilities on notice of these improper relationships. Alpert discussed Frost's first foray into penny-stocks with the formation of BioZone in 2008 and the article cited an interview with Honig and Brauser, calling them "two South Florida gents [who] have invested alongside Frost in a couple dozen micro-cap companies." Alpert's article also pointed out the close relationship among Frost, Honig, and Brauser, reporting that Brauser viewed Frost as a mentor, had his business in the same building as OPKO and other Frost entities, and invested in many deals with Frost because they "run in the same circles."

231.    For this reason, demand is futile as to Pfenniger, Paganelli, and Krasno.

**H.     Defendants Lerner and Krasno Face a Substantial Likelihood of Liability as Members of the Compensation Committee**

232.    Defendants Lerner and Krasno, as members of the Compensation Committee during the Relevant Period, participated and knowingly approved the unjust enrichment of the OPKO Individual Defendants.  More specifically, as members of the Compensation Committee, Lerner and Krasno were obligated to discharge the Board's responsibilities relating to compensation of the Company's executive officers and directors.  During the Relevant Period, Lerner and Krasno awarded inflated incentive-based compensation to the OPKO Individual Defendants based on the inflated share price of OPKO.  Because Lerner and Krasno breached their fiduciary duties, there is a high likelihood that they will be held personally liable in any action brought on behalf of the Company.  For this reason, demand is futile as to Lerner and Krasno.

**I.     The Director Defendants are Not Independent**

233.    In addition to the reasons stated above, none of the Director Defendants are independent due to their connection to defendant Frost.  OPKO was founded and has always been run by Frost, who until recently was seen as the Warren Buffet of biotech.  Each of the Director Defendants supports Frost and cannot disinterestedly consider a demand against Frost or any of each other.

**J.     The Director Defendants are Not Disinterested**

234.    If OPKO's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the OPKO Individual

82

Defendants in this case contain provisions that eliminate coverage for any action brought directly by OPKO against the Individual Defendants, known as the "insured versus insured exclusion."

235.    As a result, if the Director Defendants were to sue themselves or certain of the officers of OPKO, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

236.    Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting OPKO by prosecuting this action.  Therefore, demand on OPKO and its Board is futile and is excused.  OPKO has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT ONE

**Breach of Fiduciary Duties**
**(Against the OPKO Individual Defendants,**
**the Frost Pump-and-Dump Posse, and the Frost Entities)**

237.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

238.    The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities owed and owe OPKO fiduciary obligations, either directly by their positions as

officers and/or directors of the Company or through their close business relationships with the Company and/or defendant Frost as OPKO's controlling stockholder.  By reason of their fiduciary relationships, the defendants owed and owe OPKO the highest obligation of loyalty, good faith, due care, oversight, and candor.

239.    All of the defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

240.    Each of the defendants had actual or constructive knowledge of and caused the Company to fail to disclose that: (1) OPKO, Frost, Honig, O'Rourke, Brauser, Kesner, FGIT, and the other members of the Frost Pump-and-Dump Posse were engaged in several illegal pump-and-dump schemes; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its stock would be suspended from trading by NASDAQ; (3) the Company failed to maintain adequate internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  These actions caused severe risks to the Company's financial viability and have caused harm to the Company by subjecting it to the SEC Action and the Securities Class Actions.  The defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

241.    The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities consciously caused or allowed OPKO to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements.

242.    The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities consciously failed to supervise, to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

243.    As a direct and proximate result of the OPKO Individual Defendants', the Frost Pump-and-Dump Posse's, and the Frost Entities' conscious failure to perform their fiduciary obligations, OPKO has sustained significant damages.  As a result of the misconduct alleged herein, the defendants are liable to the Company.  The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities breached their fiduciary duties owed to OPKO and its stockholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee OPKO's business, rendering them personally liable to the Company.

## COUNT TWO

### For Breach of Fiduciary Duty of Loyalty
### (Against Frost)

244.    Plaintiff incorporates by reference paragraphs 1 through 236 as if fully set forth herein.

245.    Defendant Frost exercised control over OPKO in the actions and transactions challenged herein to profit himself and the Frost Pump-and-Dump Posse, at the unfair expense of OPKO, in breach of his fiduciary duty of loyalty as OPKO's controlling stockholder, CEO, and Chairman.

246.    By misusing OPKO and its assets in his self-dealing schemes, defendant Frost has put his and his associates' pecuniary interests ahead of the interests of OPKO, in breach of his fiduciary duty of loyalty.

247.    As a direct and proximate result of defendant Frost's breach of his fiduciary duty of loyalty, the Company has been damaged, and Frost has been unjustly enriched.

248.    Plaintiff has no adequate remedy at law.

## COUNT THREE

### For Breach of Fiduciary Duty in Connection
### with Misappropriation of Information and Insider Stock Sales
### (Against Logal, Lerner, Rubin, and Paganelli)

249.     Plaintiff incorporates by reference paragraphs 1 through 236 as if fully set forth herein.

250.     At the time of each of the stock sales set forth herein, defendants Logal, Lerner, Rubin, and Paganelli knew, but did not disclose publicly, that the Company was engaging in the Frost Pump-and-Dump Posse's pump-and-dump schemes.  Defendants Logal, Lerner, Rubin, and Paganelli further knew, but did not disclose publicly, that that these facts would substantially harm the Company.  Defendants Logal, Lerner, Rubin, and Paganelli made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

251.     At the time of their stock sales, defendants Logal, Lerner, Rubin, and Paganelli knew that when the Company's conduct came to light, the price of the Company's common stock would dramatically decrease.  Defendants Logal, Lerner, Rubin, and Paganelli's sales of OPKO common stock based on their knowledge of this material non-public information were a breach of their fiduciary duties of loyalty and good faith.

## COUNT FOUR

### For Unjust Enrichment
### (Against the OPKO Individual Defendants)

252.     Plaintiff incorporates by reference paragraphs 1 through 236 as if fully set forth herein.

253.    By their wrongful acts, violations of law, and misleading statements and omissions of material fact that they made and/or caused to be made, the OPKO Individual Defendants were unjustly enriched at the expense and to the detriment of OPKO.

254.    The OPKO Individual Defendants received incentive-based compensation from OPKO that was tied to the performance or artificially-inflated valuation of OPKO and/or received compensation that was unjust in light of their bad faith conduct.

255.    To remedy the OPKO Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all proceeds, including from insider transactions, excessive compensation, including any performance-based or valuation-based compensation, obtained by the OPKO Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

256.    Plaintiff, on behalf of OPKO, has no adequate remedy at law.

## COUNT FIVE

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Against the Frost Pump-and-Dump Posse)

257.    Plaintiff incorporates by reference paragraphs 1 through 236 as though fully set forth herein.

258.    The Frost Pump-and-Dump Posse participated in a scheme to defraud with the purpose and effect of defrauding OPKO.  Not only is the Company forced to defend claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, OPKO is itself one of the largest victims of the unlawful scheme perpetrated by the Frost Pump-and-Dump Posse.  While the price of several companies' common stock, including, *inter alia*, BioZone and MabVax, was trading at artificially-inflated prices as a result of the Frost Pump-and-Dump

Posse's misconduct, the Frost Pump-and-Dump Posse caused OPKO to purchase large quantities of securities at artificially-inflated prices, damaging OPKO.

259.    The Frost Pump-and-Dump Posse also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements and include false statements about OPKO in material promoting other public companies.

260.    The Frost Pump-and-Dump Posse employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made not misleading.

261.    The Frost Pump-and-Dump Posse, as members of a group that controlled OPKO, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority over the schemes described herein, the Frost Pump-and-Dump Posse controlled the conduct complained of herein and the content of the public statements disseminated.

262.    The Frost Pump-and-Dump Posse acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, although such facts were available to them. The Frost Pump-and-Dump Posse were closely aligned with the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes

set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

263.     By virtue of the foregoing, the Frost Pump-and-Dump Posse has violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT SIX

### Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

264.     Plaintiff incorporates by reference paragraphs 1 through 236 and 257 through 263 as though fully set forth herein.

265.     The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities, by virtue of their positions with OPKO and/or relationship to its controlling stockholder and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of OPKO within the meaning of § 20(a) of the Exchange Act.  The OPKO Individual Defendants, the Frost Pump-and-Dump Posse, and the Frost Entities had the power and influence and exercised the same to cause OPKO to engage in the illegal conduct and practices complained of herein.

## COUNT SEVEN

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the OPKO Individual Defendants)

266.     Plaintiff incorporates by reference paragraphs 1 through 236 as though fully set forth herein.

267.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance

upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these proxy law claims.

268.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

269.    The 2018 Proxy violated Section 14(a) and Rule 14a-9 because it solicited OPKO stockholder votes for, *inter alia*, director re-election and advisory approval of executive compensation, while simultaneously misrepresenting and/or failing to disclose that: (1) OPKO, Frost, Honig, O'Rourke, Brauser, Kesner, FGIT, and the other members of the Frost Pump-and-Dump Posse were engaged in several illegal pump-and-dump schemes; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its stock would be suspended from trading by NASDAQ; (3) the Company failed to maintain adequate internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

270.    As alleged herein, in the 2018 Proxy, the OPKO Individual Defendants specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.  Because the Company, under the OPKO Individual Defendants' direction and on their watch, was issuing false and misleading statements, the OPKO Individual Defendants affirmatively violated the Code.  The Proxy failed to disclose that express terms of the Code were being violated.

271.     The OPKO Individual Defendants caused the Company to make untrue statements of material fact and omit material facts necessary to make the issued statements not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2018 Proxy, the OPKO Individual Defendants were aware of this information and of their duty to disclose this information in the 2018 Proxy.

272.     The OPKO Individual Defendants knew, or were negligent in not knowing, that the statements contained in the 2018 Proxy were materially false and misleading.

273.     The omissions and false and misleading statements in the 2018 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors and the approval of executive compensation.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2018 Proxy and in other information reasonably available to stockholders.

274.     As a direct and proximate result of the dissemination of the false and/or misleading 2018 Proxy the OPKO Individual Defendants used to obtain stockholder approval of and thereby re-elect directors and gain approval of executive compensation, OPKO suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

275.     Plaintiff on behalf of OPKO has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of OPKO and that Plaintiff is an adequate representative of the Company;

B.      Declaring that each of the OPKO Individual Defendants and Frost Entities breached their fiduciary duties to OPKO;

C.      Awarding the amount of damages sustained by the Company as a result of the OPKO Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

D.      Ordering the defendants to disgorge the profits obtained as a result of their unjust enrichment as described herein;

E.      Ordering defendants Logal, Lerner, Rubin, and Paganelli to disgorge to the Company all proceeds derived from their sales of OPKO common stock alleged herein.

F.      Granting appropriate equitable relief to remedy the OPKO Individual Defendants' and Frost Entities' breaches of fiduciary duties and other violations of law;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 31, 2018                    Respectfully submitted,

**KOMLOSSY LAW, P.A.**
By:   */s/ Emily Komlossy*
Emily Komlossy (FBN 7714)
4700 Sheridan Street, Suite J
Hollywood, FL 33021
Telephone: (954) 842-2021
Facsimile: (954) 416-6223
eck@komlossylaw.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Todd H. Henderson
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  212-308-5858
eagel@bespc.com
henderson@bespc.com

*Counsel for Plaintiff*